BLACKARD, ET AL. *v.* STATE.

4611*                      232 S. W. 2d 977

Opinion delivered October 2, 1950.

* Cases numbered 4612 to 4621 inclusive by other petitioners were disposed of in this opinion.

*Yates & Yates* and *Grant & Rose,* for petitioners.

*Ike Murry,* Attorney General, for the State.

*Thomas Harper,* for intervener.

ED. F. McFADDIN, Justice. Each of the eleven petitioners seeks, by *writ of certiorari,* to have this Court quash the Chancery Court order which found each petitioner guilty of contempt and assessed punishment. The contempt proceedings were tried in a consolidated hearing in the Chancery Court; so the eleven petitions for *certiorari* have been consolidated in this Court.

The contempt proceedings spring from a labor dispute. When the Utah Construction Company (hereinafter called "Utah") undertook to remove coal from its Ozark-Philpott Mine, a labor dispute arose as to whether the mine would be operated by members of the United Mine Workers of America. On petition of Utah, the Chancery Court issued a temporary order, and later a permanent order (on January 19, 1950), restraining the Union, its members, and all other persons, not only (a) from picketing any and all persons or places so as to

interfere in any way with Utah's operation, but also (b) from "attempting to prevent in any manner by the use of force or otherwise the plaintiff (Utah) from operating its property."[1]

Sometime after the issuance of the permanent restraining order, the eleven petitioners herein, and also several other parties, were cited for conduct alleged to be in contempt of the Court, and as being in violation of the said restraining order. After a careful, patient and thorough hearing, the Chancery Court found that certain of those cited had not been in contempt, but that each of the eleven petitioners herein was guilty of contempt for violation of the said permanent restraining order. Punishments were assessed as hereinafter stated. From the orders of punishment each of the eleven petitioners invokes *certiorari*; and the major contention is that the evidence fails to support the Court's finding that a contempt had been committed by any individual petitioner.

[1] The wording of the permanent injunction is:

"That the defendants . . . and all other persons acting in concert with them be, and they are hereby permanently restrained and enjoined from committing, encouraging, permitting or causing to be committed any of the following acts:

"Picketing in any manner, either singly or in larger numbers, plaintiff's property or plaintiff's employees, or any roads, railroads or other means of access thereto; in Johnson or Franklin Counties, State of Arkansas, or any other places within the State of Arkansas; congregating in any manner at or near plaintiff's property or anywhere else for the purpose of picketing plaintiff's property and its employees or any other persons desiring to enter upon and leave plaintiff's property or to do business with plaintiff upon its property or at any other place; in any manner from threatening, intimidating, accosting or detaining any of plaintiff's employees, or from threatening or intimidating by any means whatever any of plaintiff's employees or members of their families, and from interfering in any manner with any of plaintiff's employees to prevent them from working peaceably upon plaintiff's property and from preventing or *attempting to prevent in any manner by the use of force or otherwise the plaintiff from operating its property, known as the Ozark-Philpott Mine*, or in any manner from interfering with or preventing by any means whatever any of the plaintiff's employees in going to and from plaintiff's property or anywhere else for the purpose of carrying on their employment with plaintiff, or from going on plaintiff's property, or damaging or interfering in any manner with any of plaintiff's property for the above purposes:" (Italics are our own.) This injunction must, of course, be now considered as a completely valid one. Since no appeal was taken from the decree in which it was issued, we have no occasion to pass on it. *Carnes* v. *Butt*, 215 Ark. 549, 221 S. W. 2d 416.

At the outset it is appropriate to state some of the rules applicable to such a situation as is here presented:

I. "Criminal contempt proceedings are those brought to preserve the power and vindicate the dignity of the court and to punish for disobedience of its orders. Civil contempt proceedings are those instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders and decrees made for the benefit of such parties." Definitions of, and distinctions between, civil contempt and criminal contempt may be found discussed in a number of cases. See *Gompers* v. *Buck's Stove & Range Company*, 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A., N. S. 874; *Bessett* v. *W. B. Conkey Company*, 194 U. S. 324, 24 S. Ct. 665, 48 L. Ed. 997; *In re Nevitt*, 117 Fed. 448; *Wakefield* v. *Housel*, 288 Fed. 712; *Parker* v. *United States*, 153 Fed. 2d 66, 163 A. L. R. 379; see 12 Am. Jur. 392, from which the above quoted words have been taken; and see, also, 17 C. J. S. 7.

One of the reasons for the distinction between criminal contempt and civil contempt is because it is generally held that in criminal contempt proceedings the proof must be beyond a reasonable doubt. In the case at bar the proceedings involve criminal contempt; and the trial court held that the proof had to be beyond a reasonable doubt, just as in a criminal case.[2] This ruling was correct. See *Gompers* v. *Buck's Stove & Range Company*, *supra*; *Michaelson* v. *United States*, 266 U. S. 42, 69 L. Ed. 162, 45 Sup. Ct. 18, 35 A. L. R. 451; *Davidson* v. *Wilson*, 286 Fed. 108; and see 12 Am. Jur. 441 and cases there cited. See, also, Annotation in 49 A. L. R. 975, "Degree of Proof Necessary in Contempt Proceedings." This ruling gave the petitioners the benefit of every reasonable doubt. We will subsequently discuss whether the evidence was sufficient to establish, beyond a reasonable doubt, the commission of contempt by each petitioner.

II. The correct procedure to obtain a review by this Court of the judgment of the trial court in a contempt case is by *certiorari*, just as is here invoked. See *Whorton* v. *Hawkins*, 135 Ark. 507, 205 S. W. 901. In *McCain*

---

[2] The decree of the Chancery Court specifically states that the contemnors were guilty "beyond a reasonable doubt."

*v. Collins,* 204 Ark. 521, 164 S. W. 2d 448, we said: ''The office of the writ (of *certiorari*) is merely to review the errors of law, one of which may be the legal sufficiency of the evidence.'' See, also, *Bertig Bros.* v. *Independent Gin Co.,* 147 Ark. 581, 228 S. W. 392.

III. On review by this Court in such proceedings by *certiorari,* we do not try the criminal contempt case *de novo,* despite any such language so intimating as contained in *Jones* v. *State,* 170 Ark. 863, 281 S. W. 663. Rather, we review the evidence just as we would in an appeal in any criminal case. The trial court in the first instance, in a criminal contempt proceeding, must find the cited person guilty beyond a reasonable doubt. Then, on *certiorari* proceedings this Court reviews the record to determine whether the evidence, when given its full probative force, is sufficient to sustain the finding of the trial court. See *Stewart* v. *United States,* 236 Fed. 838; *Binkley* v. *United States,* 282 Fed. 244; *Davidson* v. *Wilson,* 286 Fed. 108; and *In re Oriel,* 23 Fed. 2d 409.

So much for the general rules. With these rules in mind we have examined the record herein concerning each of the eleven petitioners. The main insistence of the petitioners is that the evidence is insufficient to support the finding of the Chancery Court; and this insistence makes necessary a review of the salient evidence regarding each contemnor. Evidence was presented concerning three or more separate incidents. We will discuss the case as it relates to each petitioner.

(a)—The contempt by the petitioner, Woodrow Thompson, consisted of threatening an employee, William Almond, who at all times was employed by Utah at its Ozark-Philpott Mine. Almond testified that after the permanent injunction had been granted, Woodrow Thompson approached him and said: ''I hope every damn one of you have to work for 50 cents a day . . . We're after you . . . If you go back out there and go to work, I'm going to get your———.'' Certainly these statements, if made by Thompson, were in contempt of the injunction because they constituted threatening an employee of Utah; but it is insisted by Thompson that he made no such statements, and several witnesses who

professed to have heard the entire conversation said that Thompson did not make the said remarks. With the evidence in conflict, it became a matter for the trial court—with the same prerogative in this case as a jury has in a criminal case—to determine which testimony to believe. We will subsequently discuss this matter of credibility.

(b)—The contempt by the petitioner, Matt Snider, consisted of attempting to intimidate Jack Morton, an employee of Utah. Morton testified that Snider approached him when the two were alone. Morton testified of Snider:

"Q.—He came on out to the car and he said, 'You think you've got a good job, do you?'—and used a few cuss words; he said, 'You think you've got a pretty God-damned good job, do you?', and I said, 'Yes, fair,' and he said, 'Well, you're just putting guys like me out of work,' and I said, 'Well, I can't help that. I've got to make a living,' and he went ahead to say, 'You won't work out there long,' and I said, 'Why?', and he said, 'Well,'—he said, 'guys like me are going to stop you,' and I said, 'You are?', and I said, 'Well, as long as they let me work, I'm going to work out there,' and he just went ahead cussing and left a cussing. He said I wasn't going to work out there very long, or nobody else work out there very long."

Snider denied that he had such a conversation with Morton; and Snider was supported by several witnesses who testified that if any such conversation had taken place, they would have heard it. What we have previously said about the case against Woodrow Thompson applies with equal force to the case against Matt Snider; and we will later discuss the matter of credibility.

(c)—The contempts by each of the remaining nine petitioners arose from their efforts to prevent Ed Willey and his truck drivers from hauling shale to the Utah mine from a pit located twelve or fourteen miles away. That this shale was necessary for Utah's continued operation was definitely established. Petitioner Ogalvie at one time had a contract for his trucks to haul the shale, and he either surrendered the contract or lost it. At all

events, Ed Willey was under contract for his trucks to haul the shale. One disinterested witness (Chester Emil) testified that Ogalvie told him that Ogalvie would not deliver the shale because it was not a Union job, and that if Willey could not haul the shale, then Utah "would have to go Union."

Another disinterested witness (Sid Skaggs) testified that Ogalvie and Cecil Ross (one of the petitioners) were together when Ross told Skaggs that Ross "was going to have a bunch out there to stop Ed Willey from hauling shale." On Friday, January 20, a group of men arrived at Skaggs' store which was located about a mile from the shale pit and at a place where the road to the shale pit left the main highway. Skaggs suggested to the men that an injunction had been granted against picketing and interfering with Utah's operation; but the spokesman for the group advised Skaggs that the injunction was not effective in the County in which Skaggs' store and the shale pit were located.[3]

Petitioners Ogalvie, Bud Ross, and Cecil Ross seemed to have been the "mainsprings" of the plan to stop Willey's trucks from hauling the shale. Ogalvie and Cecil Ross, with petitioner Bud Wise, actually assaulted, or assisted in an assault on Willey on Saturday, January 21, after the assemblage of the others at the shale pit on Friday, January 20, had failed to serve as a sufficient deterrent from the hauling. The other five petitioners (Blackard, Killough, McCleary, Marvel, and Webb) either congregated at the shale pit for the purpose of intimidation or otherwise assisted in attempts to deter Willey and his truck drivers from hauling shale for Utah. Their principal defenses were (a) that the differences with Willey arose out of matters other than the Utah injunction, and (b) that the petitioners happened by mere coincidence to be at the shale pit and at Skaggs' store.

It is argued that all that some of the petitioners did was to assemble at the shale pit on Friday, January 20,

---

[3] In this conclusion the spokesman was in error, as is shown by the injunction copied in a preceding footnote.

and that such an assemblage was not a picket line. We are not considering any question relating to picketing, because the contemnors violated that part of the injunction which was a restraint "from preventing or attempting to prevent in any manner . . . the plaintiff from operating its property known as the Ozark-Philpott Mine . . ." We agree with the Chancellor that the assemblage at the shale pit was an attempt to prevent the hauling of the shale to Utah's mine. J. W. Lee testified that an assemblage of twenty or twenty-five men at the shale pit had never occurred previously or subsequently. Lee operated the loading machine for Willey at the shale pit and testified that Willey's truck drivers were accosted and engaged in conversation by some of those in the assemblage. C. C. Patton, one of the truck drivers for Willey, detailed the conversation Cecil Ross had with him to the effect that if the shale wasn't hauled, Utah would have "to go Union." Dexter Curtis, another of Willey's truck drivers, testified to like effect.

The record is voluminous: the transcript consists of 490 typewritten pages; and the abstracts and briefs consist of 281 printed pages. To review all of the evidence would serve no useful purpose. The evidence regarding these nine petitioners is in the same hopeless conflict as is that concerning the two petitioners previously mentioned; and we therefore now discuss the matter of credibility.

If the evidence should be weighed by the mere number of witnesses, then probably the petitioners should prevail; but the evidence in a case like this, just as the evidence in any case, is to be tested by the truth and not by the number of witnesses. In *Romines* v. *Brumfield*, 199 Ark. 1066, 136 S. W. 2d 1023, we quoted Ballentine's Law Dictionary:

"The weight of evidence is not a question of mathematics, but depends upon its effect in inducing belief. One witness may be contradicted by several and yet his testimony may outweigh all of theirs. The question is not on which side are the witnesses more numerous, but what is to be believed."

Immediately after the conclusion of the evidence, the Chancellor delivered an opinion from the bench which when transcribed consumes ten typewritten pages. The opinion shows a masterful grasp of the evidence, and contains a review of the testimony on each of the alleged acts of contempt. In one portion of the opinion the Chancellor, in referring to some evidence offered by the petitioners, said: ''I don't believe a word of it.''

The Chancellor heard the witnesses testify and observed the demeanor of each while on the witness stand and has positively stated in the record that the basis of his finding was the truthfulness of the testimony offered to show the contempt by each of the eleven petitioners and the falsity of the testimony of their defense. As previously stated, we review the evidence in this case just as we would an appeal in an ordinary criminal case, that is, to determine whether the evidence, when given its full probative force, is sufficient to sustain the finding of the trial court. We find that it is.

Twenty-two individuals were cited for contempt. The Chancery Court, after a painstaking hearing, found that the evidence was insufficient against eleven of the petitioners, but found that the evidence of contempt was sufficient against the eleven petitioners herein; and assessed fines of $25 each against the petitioners Thompson, Snider, Blackard, Killough, McCleary, Marvel, and Webb. Bud Wise was fined $50. Ogalvie and Cecil Ross were each punished by a fine of $200 and thirty days in jail; and Bud Ross received a fine of $100 and a ten day jail sentence.

A careful review of the entire case convinces us that each of the eleven petitions for *certiorari* should be denied and that the order of the Chancery Court, finding each of the petitioners to be in contempt and adjudging punishment, therefore should be allowed to remain in full force in all respects.