STEWART, ET AL. *v.* STATE.

4705 TO 4713                    254 S. W. 2d 55

Opinion delivered January 19, 1953.

*G. Love Grant* and *Gutensohn & Ragon,* for appellant.

*Ike Murry,* Attorney General, and *George E. Lusk, Jr.,* Assistant Attorney General, for appellee.

GEORGE ROSE SMITH, J. By *certiorari* the nine petitioners bring up for review an order by which the chancellor punished them for criminal contempt. The trial court found that the petitioners had violated a temporary injunction which prohibited certain picketing activity. Charles E. Stewart, a representative of the international labor union involved, was fined $200 and sentenced to serve thirty days in jail. Allen Jones, the president of the local union, was fined $50. Six other petitioners, members of the local union, were fined $10 each. G. L. Grant, the attorney who advised the union members to take the action that was later deemed by the chancellor to be contempt of court, was fined $500 and sentenced to serve thirty days in jail, but the chancellor suspended the jail sentence because of Grant's age and poor health. For reversal the petitioners contend that the chancellor was in error in holding that the temporary injunction had been disobeyed.

Although there are minor conflicts in the testimony, the salient facts are not in dispute. In March, 1952, the employees of the Dixie Cup Company went on strike. Picket lines were established at Dixie Cup's principal

place of business in Fort Smith, and in addition the striking employees picketed in the vicinity of a warehouse owned by Federal Compress & Warehouse Company. Storage space in this warehouse had been rented to Dixie Cup and to other business concerns, and one or more of the Dixie Cup employees ordinarily worked there. The present dispute centers upon the picketing that occurred at the warehouse.

This warehouse is served by two railroad spur tracks, the Missouri Pacific track entering from the east and the Kansas City Southern from the west. Twenty-third Street lies on the east side of the compress company's property and is crossed by the Missouri Pacific track as it enters the premises. There are also two motor vehicle entrances on the east, one leaving Twenty-third Street about seventy-five yards north of the track and the other about fifty yards south of the track.

It does not appear that the Kansas City Southern spur track, as it approaches the warehouse from the west, crosses any street in the immediate vicinity of the compress company's property. This track does, however, cross Incinerator Road at a point about a mile west of the warehouse.

At the beginning of the strike the Dixie Cup employees picketed the Missouri Pacific track at its intersection with Twenty-third Street and the Kansas City Southern track at its intersection with Incinerator Road. When the regular switching crews refused to cross these picket lines supervisory employees took charge of the trains and attempted to continue service to Dixie Cup. Thereupon the pickets, who seem to have then been without legal advice, stood between the rails and challenged the railroad employees to run over them. In the oral argument it was readily admitted by petitioners' counsel that this physical obstruction of the trains went beyond the permissible limits of picketing and was unlawful.

The railroad companies, finding themselves unable to serve Dixie Cup, filed separate suits for injunctive relief. The principal issues in this case turn upon the

wording of the temporary injunction that was immediately issued in the Missouri Pacific case. By that order the international and local unions, their members and agents, were restrained from committing the following acts:

"Picketing in any manner, either singly or in large numbers, plaintiff's railroad tracks and spur tracks or right of way or property in any manner whatsoever in the City of Fort Smith, Sebastian County, Arkansas;

"Stopping, obstructing, injuring, impairing and weakening the plaintiff's trains, railroad tracks, machinery and employees in any manner and by any means whatsoever in the City of Fort Smith, Sebastian County, Arkansas."

After the issuance of the preliminary injunctions the union members consulted Grant. At his direction the pickets were removed entirely from the Kansas City Southern spur track, but at the Missouri Pacific crossing on Twenty-third Street the picketing was merely modified. Grant went to the scene with some of his clients and decided that the pickets should keep at least fourteen feet away from the rails. A placard giving notice of the strike was set up at that distance on each side of the spur track. Thereafter the pickets patrolled between those placards and the highway entrances to the warehouse, one picket walking between the north placard and the access road seventy-five yards to the north and the other picket traveling between the south placard and the southern access road. This modified form of picketing proved to be effective, as the regular train crews still refused to drive the trains into the warehouse premises when destined for Dixie Cup, even though the pickets had been instructed to, and did, call out to the trainmen that the railroad was not being picketed and that they were free to serve Dixie Cup if they wished. In this situation the Missouri Pacific was compelled to man its trains with supervisory employees in the five-week interval between the issuance of the temporary order and the final hearing. As we have intimated, there was no interruption

in the carrier's normal service to the other lessees of the compress company.

When at the final hearing the chancellor learned what was taking place he caused nine of the union members to be cited for contempt, and later on Grant was cited as well. One of the nine employees was found not guilty; the other eight and Grant have brought the case to us. It will be convenient to consider separately the contentions of the union members and those of their attorney, even though the arguments are to a large extent overlapping.

At the trial several employee witnesses testified that it was not their intention to picket the Missouri Pacific; instead, their activity was directed solely against trucks entering the warehouse by way of the two access roads. The chancellor was fully warranted in treating this version of the matter as a subterfuge. It will be remembered that a placard had been placed on each side of the track, fourteen feet from the rail. These signs faced east, so that they were clearly visible to approaching trainmen. Yet these signs could have been seen by a truck driver only as he came abreast of them, which he might not even do, since a truck coming from the north might turn in the northern access road seventy-five yards away from the nearer sign and equally far from the picket if that person happened to be at the other end of his route. It was conceded in oral argument that the picketing would have been more effective as to motor vehicle traffic had it been confined to the highway entrances.

Stress is laid on the fact that the pickets were withdrawn from the Kansas City Southern track. Incinerator Road, however, does not lead to the warehouse; so it is reasonable to conclude that the cessation of picketing at that intersection was due to the fact that continued activity would have undeniably been aimed at the railroad alone.

Reliance is also placed on the pickets' action in announcing to trainmen that the railroad was not being picketed. Yet this was evidently an empty gesture when

the experience of five weeks showed that the regular crews steadfastly declined to cross what they undoubtedly regarded as a picket line. Indeed, one of the attorneys for the petitioners inadvertently recognized this to be true when, by a slip of the tongue, he put this question to a witness: "Did they [the trainmen] cross the picket line? Excuse me. There was no picket line according to my theory. Did they cross the highway at that point?" On the whole we do not think it can be seriously argued that the picketing was intended for the benefit of truck traffic only.

Grant's defences, which are advanced by the other petitioners as well, have to do with the wording of the temporary order. It is first said that the order is ambiguous. In this connection counsel point out that the preliminary injunction forbade "picketing in any manner . . . plaintiff's railroad tracks," but in the final decree this was changed to "picketing in any manner . . . at, on or near plaintiff's railroad tracks." Of course the mere fact of amendment does not demonstrate that the first order lacked clarity, since even a very exact statement may often be made still more precise by the use of additional language.

We do not think the temporary order subject to the charge of ambiguity. The second paragraph which we have quoted enjoined the defendants from stopping or obstructing the plaintiff's trains. This language was doubtless directed at the physical obstructions which led to the suit, though it is perhaps broad enough to encompass any picketing which brought about the forbidden result. But this provision does not stand alone. The court also enjoined the defendants from picketing "in any manner" the plaintiff's tracks. We do not see how this sweeping prohibition could be misunderstood; certainly it includes picketing "at, on or near" the tracks, as the final order put it. That the petitioners thought the order too comprehensive is of course immaterial, since it was their duty to obey even an erroneous decree as long as it continued in force. *Carnes* v. *Butt, Chancellor*, 215 Ark. 549, 221 S. W. 2d 416.

A more subtle contention is that since the temporary injunction prohibited picketing *against the railroad* it was not violated by conduct which *as a matter of law* was directed only against Dixie Cup. It is insisted, in other words, that even though the picketing prevented the regular train crews from serving Dixie Cup the boycott was nevertheless against the employer rather than the carrier. Our study of the record convinces us that Grant so construed the order in advising his clients. For instance, it is shown that he read to them our opinion in *Mo. Pac. R. Co.* v. *United Brick etc. Union*, 218 Ark. 707, 238 S. W. 2d 945. There we held that picketing similar to that which led to these contempt citations was directed against the employer and did not amount to a secondary boycott against the railway company. It is evident that a lawyer of Grant's experience and ability would not have considered the cited case even to be relevant except upon the theory now advanced; that is, that the injunction prohibited picketing "against the railroad" only in the sense that disinterested outsiders were not to be dissuaded from doing business with the carrier. Again, this construction of the order explains why the pickets were removed from the Kansas City Southern crossing, for at that point no primary boycott of Dixie Cup was possible. This view, had it been correct, would also have justified Grant in permitting his clients to come within fourteen feet of the Missouri Pacific tracks even though that conduct was calculated to prevent normal train service to Dixie Cup.

Needless to say, both Grant and his clients took the risk that his interpretation of the injunction might be incorrect. We have no doubt that the advice given was erroneous. Mr. Grant, in construing the chancellor's proscription of any picketing of the railroad, in effect took the language from its context and analysed it as if it were a completely isolated phrase. But the injunction was issued in a contested case, in response to a complaint, and must be read in its proper setting. The Missouri Pacific's complaint contained no suggestion that an independent boycott, unconnected with the Dixie

Cup dispute, had been imposed upon the plaintiff. Instead, the complaint averred that in the course of their strike against Dixie Cup the defendants had blocked the railroad track with their bodies, that such conduct was unlawful, and that the defendants should be enjoined "from committing any of the acts aforesaid, and from picketing the plaintiff's railroad tracks." It is not reasonable to suppose, as Grant must have done, that the chancellor not only chose to ignore the issues in the case but also went out of his way to forbid conduct that was neither alleged to have occurred nor even remotely likely to take place. On the other hand it is perfectly reasonable to believe that the chancellor, upon being shown that illegal acts had been committed, decided to restrain all picketing that might affect the train service to Dixie Cup until the matter could be explored upon final hearing. We regard the latter as the only permissible interpretation of the order and conclude that the proof shows beyond a reasonable doubt that the continued picketing amounted to criminal contempt.

In the main we affirm the decree, but three modifications are necessary. First, the trial court suspended Grant's jail sentence "due to the age and health of the defendant." This reference to the attorney's health does not seem to mean a sudden or temporary illness rendering immediate confinement inadvisable. Rather, the court's clemency seems to have been motivated by the fact that this petitioner is seventy-two years old and not well able to withstand the hardships of a month in prison. We think it best to state explicitly that in these circumstances the suspension of the sentence is in effect its complete remission. In ordinary criminal cases a suspended sentence is a useful deterrent to later wrongdoing. The same considerations do not apply in cases of contempt, and we are aware of no authority for an indefinite suspension in a case of this kind.

Second, Charles E. Stewart, the representative of the international union, was fined $200 and sentenced to serve thirty days in jail. When we consider the record as a whole, and especially when we remember that

Stewart merely followed the directions given by Grant, whose punishment does not involve imprisonment, we are not willing to approve the jail sentence in Stewart's case.

Third, three of the petitioners, John Pettyjohn, Millard Davis, and Russell Clyma, are not shown by the record to have committed overt acts amounting to criminal contempt of court. These men were assigned to night picket duty and merely sat in their cars at some distance from the Missouri Pacific track. Doubtless they were ready to disobey the injunction had the occasion arisen, but we find no actual disobedience. The nominal fines of $10 each assessed against these three petitioners are set aside.

With the modifications mentioned the decree is affirmed.

GRIFFIN SMITH, Chief Justice, dissenting. The majority opinion rests upon the proposition that the Chancellor concluded to restrain all picketing that might affect Dixie Cup train service "until the matter could be explored upon final hearing." For, say the judges who make this explanation, "We regard [this] as the only permissible interpretation of the order and conclude that the proof shows beyond a reasonable doubt that the continued picketing amounted to criminal contempt." It is then said: "When we consider the record as a whole, and especially when we remember that Stewart merely followed directions given by Grant, . . . we are not willing to approve the jail sentence in Stewart's case."

But as authority for holding the pickets and their advisors guilty of criminal contempt the case involving Missouri Pacific Railroad Company against United Brick and Clay Workers' Union, Local No. 602, is cited to emphasize the position taken there that the picketing was directed against the employer, hence it did not amount to a secondary boycott against the railway company. The writer of the majority opinion handed down today wrote the opinion in the case just cited. In concluding it was said: "We . . . think it rather far-fetched to sup-

pose that [by the Act of 1868] the General Assembly intended . . . to establish a policy making a picket line unlawful *simply because sympathetic railway employes prefer not to cross it.*" The opinion will not be two years old until May of 1953, and yet it is having the fundamental substructure kicked from under it with as little reference to consistency as though never intended as a judicial expression.

Gist of the controversy lies in the fact that the picketing strikers personally notified railway operatives that they were not striking against or picketing Missouri Pacific. The record does not show that after the injunction these defendants went upon railroad property. Of course one against whom a restraining order has been issued in circumstances where the court had jurisdiction assumes the risk of determining what the limitation or circumscription is, and he is not excused if, acting in good faith, the order is disobeyed. But in the case before us an experienced attorney (who is one of the defendants) read this court's more recent decisions and told the men they could not picket railroad premises. But they could, said the attorney, stay off of the company's property and direct their activities against truckers who were not included in the restraining order.

But while I would reverse and dismiss the criminal convictions, this would be done with an opinion expressing the utmost respect for the fine qualities inherent in the Chancellor whose many outstanding decisions and whose devotion to idealistic jurisprudence serve to remove the slightest suspicion that in rendering judgment against the petitioners he was actuated by any purpose other than impartial administration of the law. It is my thought that *retrospectively* the Chancellor believed that he had intended to prohibit picketing, *per se.* Wording of the order, however, was not sufficient to encompass what the Chancellor subsequently considered he had made clear.

Rhetorically the result is neither fish, flesh, nor fowl from a judicial standpoint. There is a finding that the injunction was disobeyed, that the defendants are guilty of criminal contempt beyond a reasonable doubt, but by

fiat the jail sentences are removed. If inconsistencies of the opinion were disregarded all urge to exercise the pardoning power would be eliminated and logic would remain unassailed.

ROBINSON, Justice (dissenting). Mr. Grant did not represent the union members at the hearing when the temporary injunction was issued, but when the order was served they sought his interpretation of the injunction which provides:

"Picketing in any manner, either singly or in large numbers, plaintiff's railroad tracks and spur tracks or right-of-way or property in any manner whatsoever in the City of Fort Smith, Sebastian County, Arkansas;

"Stopping, obstructing, injuring, impairing and weakening the plaintiff's trains, railroad tracks, machinery and employees in any manner and by any means whatsoever in the City of Fort Smith, Sebastian County, Arkansas."

Construction of the second paragraph is not necessary, since its meaning is so clear. And there is no claim that this portion of the order was violated in any respect. But it is a different matter as to the first paragraph, which prohibits picketing railroad tracks, or spur tracks, in any manner whatsoever.

The railroad employees were informed that the railroad was not being picketed, and the trains thereafter crossed the picket line and serviced all the users of the warehouse, with the exception of the Dixie Cup Company. No complaint whatever was made by anyone that the temporary order was violated until the trial on the issue of whether the order should be made permanent. It was then that the trial court came to the conclusion there may have been a violation of the temporary injunction and ordered the institution of the contempt proceedings.

The strikers were not enjoined from picketing the Dixie Cup Company, the concern with whom they had a dispute. They had no quarrel with the railroad company. The decision Mr. Grant had to make was whether

the presence of pickets at the point where the railroad tracks enter the property, on which the warehouse used by the Dixie Cup Company was located, could be considered as picketing the railroad tracks. In reaching his conclusion he was guided by *Missouri Pacific Railroad Company, Thompson, Trustee* v. *United Brick and Clay Workers' Union, Local No. 602,* 218 Ark. 707, 238 S. W. 2d 945, which was handed down April 9th, 1951. In view of what was said in that case, I do not see how it can be held that the placing of pickets near the railroad right-of-way, at a point where the tracks entered warehouse property, could be construed as picketing the railroad tracks. In fact, it was specifically held in the above case that the location of pickets in an identical situation did not constitute picketing the railroad company. In that case the court said:

"The striking employees, members of the appellee labor union, established picket lines at the highway gates and also at a point about a quarter of a mile from the plant where the main line crosses a public highway. . . . The proof makes it plain that the pickets' purpose is to convey their message to trainmen who are on their way to the Acme plant. . . . This case differs from the average only in that the pickets patrol an isolated railroad crossing instead of a sidewalk used by the general public. But the railroad track is a means of access to the Acme plant, and we think it immaterial that the railroad company alone habitually uses this entrance. It is easy to imagine a sawmill situated in a forest, accessible only by rail. Unless pickets could present their message to persons arriving by train such a mill would be immune from the usual means of advertising the existence of a strike. . . . In an effort to show that the appellee's purpose is illegal the appellant presents a threefold argument. First, it is said that the picketing prevents the railroad from complying with its duty to provide equal and nondiscriminatory service to all shippers. . . . This argument is unsound. It is at least questionable whether a railroad is required to provide service when impeded by a strike beyond its control.

. . . But a more clear-cut answer to this contention is that the purpose of the picketing is not to prevent the carrier from performing its duties; that is merely an incidental result. And that result comes about only because the railroad's own employees, over whom it presumably has control, are refusing to cross the picket line. Carried to its logical end the appellant's argument would outlaw all picketing, since it could always be shown that some employee of a motor carrier or other public utility had refused to enter the strike-bound premises. . . . The picket line is maintained as close to Acme's plant as is possible without a trespass. As we have already seen, the fact that the appellant alone is affected is immaterial. Like most picket lines this one has among its purposes that of discouraging outsiders from doing business with the strikers' former employer. In its present location the picketing is primary and not secondary. . . . As to the federal law, the exact point was decided adversely to the appellant in Ryan Construction Corp., 85 N.L.R.B., No. 76. There the strikers picketed the entire premises, including a gate which had been cut in the fence for the exclusive use of a construction company which was working on a project for the strike-bound employer. The employees of the construction company refused to cross the picket line at their special gate. The Board held that the picketing, even though it affected only the construction company, was primary and therefore not an unfair labor practice under the cited section of the Taft-Hartley Law. So here, the appellee is picketing both entrances to the Acme plant, and the strike is not directed against the appellant merely because it is the only visitor using this particular entrance.''

According to the evidence, Mr. Grant read the above case over with the strikers and came to the conclusion that placing the pickets at the point where they were finally placed could not be considered as picketing of the railroad company and, consequently, would not be in violation of the restraining order. It seems to me that anyone, while acting with the utmost good faith, and with the intent of abiding by both the letter and the spirit of

the temporary injunction, could arrive at the same conclusion as Mr. Grant and the striking employees, in this instance. Therefore, I do not believe the facts justify a contempt conviction; and I respectfully dissent from the majority opinion.