HARRY WOOD *v.* JOHN W. GOODSON, CIRCUIT JUDGE

5732                                    485 S.W. 2d 213

Opinion delivered October 9, 1972

*Arnold & Arnold,* by: *G. William Lavender,* for petitioner.

*Ray Thornton,* Atty. Gen., by: *Fred Harrison,* Asst. Atty. Gen., for respondent.

CONLEY BYRD, Justice. Petitioner Harry Wood, editor of the Texarkana Gazette was ordered by the respondent John W. Goodson, Miller County Circuit Judge, not to publish in the morning edition of the newspaper, published on February 17, 1972, the result of the jury verdict in the case of *State of Arkansas* v. *Eugene Edward Sumler.* As a result of the publication of the article in the morning edition of February 17th, the respondent on March 2, 1972, cited petitioner to appear and show cause on March 7, 1972, why he and the Texarkana Gazette should not be held in contempt. The citation order was served on petitioner in the State of Texas. On March 7, 1972, petitioner appeared by his counsel, but not in person, and filed motions objecting to jurisdiction of his person and the power of the court to issue the order prohibiting the publication. When petitioner appeared in person on March 8th, the respondent found petitioner in contempt of court for failure to appear in person on March 7th and also in contempt for publishing the result of the jury verdict contrary to the order of the court. The fine for pub-

lishing the result of the jury verdict was set at $250 and a jail term of 60 days, both of which were suspended. However, the fine of $100 and court costs assessed for failing to appear have not been suspended.

The facts, giving rise to the order not to publish the result of the jury verdict, were recited by the respondent in the citation order as follows:

"On the 14th day of February 1972 the Circuit Court of Miller County, Arkansas began a trial session of criminal matters. Informations filed by the Prosecuting Attorneys' office charged Eugene Edward Sumler, Nathaniel Keel, Miller Lee Paxton and Robert L. Burton, Numbers 10,703; 10,709; 10,710 and 10,711 respectively with the crime of rape in the first degree. Alleging the Defendants, on the 2nd day of December, 1971, raped Cindy Ann Hayes, 13 years of age and Shellye Houston, 11 years of age as reflected in the informations. At Pre-Trial, January 31, 1972, the Prosecuting Attorney moved for the consolidation of the cases for trial. Attorneys for Eugene Edward Sumler objected, demanding a separate trial. The request of the Defendant under Arkansas law was mandatory, the Court having no discretion wherein a capital case is alleged.

"The remaining three cases were consolidated without objection. Prior to the beginning of the Court Session, a Petition was filed seeking commitment of Robert L. Burton, No. 10,711 to the Arkansas State Hospital for Nervous Diseases for thirty days observation; said Petition was granted.

"On February 15th, Cause No. 10,703, State of Arkansas versus Eugene Edward Sumler began. Following the empanelment of a Jury, the remainder of the Jury panel was excluded from the Courtroom. The Sumler case was submitted to the Jury for deliberation shortly before noon on February 16, 1972. The remaining Jury panel and additional prospective jurors whose names had been drawn from the jury wheel reported, were qualified, and a Jury was selected in Cause No. 10,709 and No. 10,710, Nathaniel Keel and

Miller Paxton respectively. During the course of the trial of cause No. 10,709 and No. 10,710 the Bailiff announced that the Sumler Jury was ready to report. The Sumler Jury was detained in the Jury room until the Paxton-Keel Jury could be removed from the Courtroom across the hall to the Judges Chambers. Following the reporting of the Sumler Jury and their discharge, the Paxton-Keel Jury was returned to the Courtroom and the reception of evidence was resumed. At the close of the normal work day, it being obvious that the Paxton trial could not be concluded, the Court admonished the Jury not to discuss the case among themselves, or to permit the matter to be discussed in their presence, not to read or hear any account of the case and that they were discharged until 9:00 the following morning.

"Mr. Tom Ayres, a reporter for the Texarkana Gazette, had been in attendance in the Courtroom throughout the trial. Following the departure of the Paxton Jury, the Court requested of Mr. Ayres that the Texarkana Gazette not publish the findings of the Sumler Jury in the next morning's edition, (February 17th), that even though the Paxton Jury had been admonished, that inadvertently some unthinking person could blurt out the findings of the Sumler Jury in the presence of a member of the Paxton Jury. That it was the Court's desire that the Paxton Jury determine guilt or innocence on the evidence and the law presented in the Paxton case and not on what some other jury may have or have not done in a companion case. The Court further stated:

" 'As far as the Court is concerned, even though the Sumler Jury had returned their verdict in open Court, I do not consider it a public record.'

"I further requested that the verdict in the Sumler case be delayed from publication in order that the pending trial would be fair and impartial. The Court then departed for the day.

"The Court was contacted later that evening at home by telephone by an individual who identified himself

as Harry Woods, Executive Editor of the Texarkana Gazette and explained that his reporter, Tom Ayres, had relayed the request of the Court not to publish the Sumler verdict in the morning edition (February 17th). I acknowledged that to be true and explained my purpose was not to muzzle the paper, but was a request to insure a fair and impartial trial for the case then pending. After a conversation between Mr. Woods and the Court pertaining to The Arkansas Bar's recommendation to the Arkansas Supreme Court, and the opposition of the Arkansas Press Association to the proposed rules regulating criminal matters, Mr. Woods stated that if he agreed to the Court's request on this occasion, that he did not know what he may be requested to do in the future. The Court again advised that his sole interest was to insure that the Defendant in the pending trial be afforded a fair and impartial trial. That the Jury had been admonished not to discuss the case among themselves, or with anyone else, nor to permit anyone to discuss the matter in their presence, nor to read or to listen to any news accounts, but that the Court was fearful that inadvertently someone would blurt out the verdict of the Sumler Jury in the presence of a Juryman of the second trial. Mr. Woods advised the Court that the Court had the authority to 'lock up' the Jury for the night. The Court advised Mr. Woods that he was aware of the powers of the Court. That the Court believes in freedom of the press; that the Court request was limited to the Jury findings not being published in the morning paper, (February 17th). That the matter could be printed after the Jury had returned at 9:00 o'clock the next day, (February 17th). Mr. Woods advised the Court he would not accede to the Court's request. Whereupon the Court withdrew the request and ordered that the verdict of the Sumler Jury not be published in the morning's edition, (February 17th). That the matter could be published in the afternoon paper, or in any later edition. Mr. Woods related that the verdict would be published.

"The Texarkana Gazette on February 17th, the following morning, prior to the resumption of trial in

the Paxton case, published an article upon its front page in a most conspicuous place, a news story concerning the Sumler verdict and the Court's order. The Article continued on the second page, . . . The article was published not only in violation of the Court's order pertaining to the Sumler verdict, but was published in such a manner as to magnify the findings of the Sumler Jury, the Court's request and subsequent order."

Petitioner contends, among other things, that the order not to publish the trial verdict is void and that as a result thereof, the second contempt for failure to appear in person to the citation order would also be subject to collateral attack. Respondent on the other hand argues that since both the fine and jail sentence for the contempt of publishing the verdict were suspended we are prevented from reviewing that part of the contempt. In doing so respondent relies upon *Stewart* v. *State,* 221 Ark. 496, 254 S.W. 2d 55 (1967), and *Johnson* v. *Johnson,* 243 Ark. 656, 421 S.W. 2d 605 (1953).

If the trial court had suspended all of the costs and fines, we would be inclined to agree that petitioner was entitled to no review on the basis that he could not obtain any relief that he did not already have. However, since the $100 fine and court cost are assessed for his failure to appear in person, we find it necessary to discuss each contempt issue.

Every court that has had an occasion to rule upon the freedom of the press to publish court proceedings, has held that whatever transpires in the court room is public property and those who see and hear it may report it without judicial censorship. See *State* v. *Morrow,* 57 Ohio App. 30, 11 N.E. 2d 273 (1937); *Phoenix Newspapers, Inc.* v. *Superior Court,* 101 Ariz. 257, 418 P. 2d 594 (1966); *State ex rel Superior Court of Snohomish Co.* v. *Sperry,* 79 Wash. 2d 69, 483 P. 2d 608 (1971), and *U.S.A.* v. *L. Dickinson and G. Adams,* (5th Cir. 1972) 465 F. 2d 496. The reason for such holdings is stated in the Phoenix Newspaper case as follows:

"The restraint imposed by the trial court in this case strikes at the very foundation of freedom of the

press by subjecting it to censorship by the judiciary.

" 'A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. * * Those who see and hear what transpired can report it with impunity. There is no special prerequisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.' *Craig* v. *Harney,* 331 U.S. 367, 374, 67 S. Ct. 1249, 1254, 91 L. Ed. 1546.

"Courts are public institutions. The manner in which justice is administered does not have any private aspects. To permit a hearing held in open court to be kept secret, ...would take from the public its right to be informed of a proceeding to which it is an interested party.

" 'One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system, of criminal justice is fair and right.' *State of Maryland* v. *Baltimore Radio Show,* 338 U.S. 912, 70 S. Ct. 252, 94 L. Ed. 562."

In *State ex rel Liversey* v. *Judge Civil District Court,* 34 La. Ann. 741 (1882), it is pointed out that there are many human rights—such as religious liberty and right of assembly and of petition—that are entirely beyond the control of judicial power. What power then does a court have to do that which the Constitution withholds and which no law could confer?

Our own Constitution, Art. 2 § 6 provides:

"The liberty of the press shall forever remain inviolate. The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, ..."

The *Phoenix Newspaper;* the *Sperry,* and the *Morrow* cases, *supra,* all hold that such orders are void and beyond the power of the courts. To the same effect see *McHenry* v. *State,* 91 Miss. 562, 44 So. 831 (1907). The same result is reached in *State ex rel Liversey* v. *Judge Civil District Court, supra.* As stated in *McHenry* v. *State, supra,* a judgment entered without jurisdiction of the person or the subject matter or in excess of the court's power is void and may be collaterally impeached. Arkansas follows the same rule. See *Martin* v. *State,* 162 Ark. 282, 257 S.W. 752 (1924).

As we view the judgment, finding petitioner in contempt for publishing the trial verdict, it falls into the same category as the order entered in *Martin* v. *State, supra.* There we held that a Circuit Court Judge did not have the power to commit an accused to the penitentiary before conviction and that the prison superintendent could not be held in contempt for failure to comply with such a void order. No court, as we have indicated, has the power to prohibit the news media from publishing that which transpires in open court. Consequently it follows that the order not to publish was void and also subject to collateral attack. See also, *Herr* v. *Humphrey,* 277 Ky. 421, 126 S.W. 2d 809, 121 A.L.R. 954 (1939), and *Ex Parte Speakman,* 32 Ariz. 307, 257 P. 986, 56 A.L.R. 169 (1927).

In *U.S.* v. *L. Dickinson, supra,* the federal court, while not exactly relieving Dickinson of the contempt fine, ruled that the order prohibiting the publication was unconstitutional and remanded the matter to the trial court to reconsider in the light of the appellate decree. Thus leaving little doubt that the result should be the same as that involved in a collateral attack.

Furthermore, the general rule is that before a person may be held in contempt for violating a court order, the order must be in definite terms as to the duties thereby imposed upon him and the command must be expressed rather than implied. See *Berry* v. *Midtown Service Corp.,* (C.C.A. 2, 1939), 104 Fed. 2d 107, 122 A.L.R. 1341. The citation order cited both petitioner and the Texarkana Gazette, a corporate entity, to appear. The terms of the order were identical to both petitioner and the corporate

entity and of course the latter could only appear by representative. We hold that under the circumstances and the legal issues involved, petitioner's appearance by counsel, was all that the order required. For this reason the $100 fine and costs were wrongfully assessed.

The rule, that constitutional issues will not be determined unless their determination is essential to a disposition of the controversy, like all other judge-made rules admits of certain exceptions. One of those exceptions is where the settlement of the controversy involves a matter of public importance. See *People* v. *Kennedy*, 207 N.Y. 533, 101 N.E. 442; *Borgnis* v. *Falk Co.*, 147 Wis. 327, 133 N.W. 209 (1911); and 16 Am. Jur. 2d Constitutional Law § 113.

Petition granted. Contempt judgments vacated.

HARRIS, C.J. and FOGLEMAN, J., concur.

CARLETON HARRIS, Chief Justice, concurring. While I agree with the concurring opinion written by a fellow Judge to the effect that this case can be disposed of without passing on the constitutional question involved, I am very much of the view that this court is acting correctly and properly in disposing of that constitutional issue. It is true that we have said that we will not pass upon constitutional questions unless necessary to the determination of the case, but, like most other legal doctrines, there are exceptions to the rule. An exception is where the question is one of great public importance. As pointed out by the Wisconsin Supreme Court in the case of *Borgnis* v. *Falk Company*, 147 Wis. 327, special circumstances can make it the duty of a court to pass upon constitutional questions even where a decision on that question is not essential to the disposition of the case before it. In *Falk* the question was the validity of a statute concerning workmen's compensation. The court said:

"It seems to be true that this action might very well be disposed of without considering the question of the validity of the act in question. Ordinarily under such circumstances that course would be the proper one to pursue, for the question of the constitutionality of a statute passed by the legislature is not one to be lightly

taken up, and generally such a question will not be decided unless it be necessary to decide it in order to dispose of the case. *There are circumstances here present, however, which seem to call very loudly for immediate consideration of the question of the validity of the act in question, if under any view of the case it can be considered as involved.* [My emphasis] ***

A considerable number of employers have accepted the terms of the act, but unquestionably many are waiting until the question of the constitutionality of the act be authoritatively settled by this court. **** *Such a condition of uncertainty ought not to be allowed to exist if it can be removed.* [My emphasis] This court cannot properly decide questions which are not legitimately involved in *bona fide* lawsuits, but it may properly decide all questions which are so involved, even though it be not absolutely essential to the result that all should be decided."

The above language which I have italicized expresses my view of the question now before us. For the last several years, there has been prolonged discussion by bench and bar and the news media relative to "fair trial and free press". Courts in some other jurisdictions have promulgated rules establishing just how far a court can go in preventing publication of newsworthy facts which it feels might be detrimental to the right of a fair trial of some defendant. This court was asked to promulgate certain rules in this field, but declined to do so. The constitutional question that has arisen in the instant litigation can, and probably will, arise again unless the issue is laid to rest. I see absolutely no point in by-passing this main question, and withholding a decision until another day, and I accordingly wholeheartedly join in the majority opinion.

JOHN A. FOGLEMAN, Justice, concurring. At the threshold of every case there is an important barrier that must be surmounted before any action by any court is warranted or permissible. That is the question of the court's jurisdiction both of the subject matter and of the persons of the parties. I feel compelled to register my protest because the majority has ignored this barrier and has neith-

er climed or hurdled it. But it has not gone away. The very first pleading filed by petitioner was a special appearance asserting that the extraterritorial service of the citation for contempt did not confer jurisdiction upon the circuit court and asking that the service be quashed. The circuit judge denied petitioner's motion to quash this service before any other pleading was filed or even mentioned. It was only then that petitioner filed a motion for disqualification of the circuit judge, subject to his special appearance to contest jurisdiction. Only after this petition had been overruled did the pleading upon which this court chooses to act ever enter into the matter. This was petitioner's demurrer to the citation, also specifically made subject to the special appearance to contest jurisdiction. It was a general demurrer which was promptly overruled. Immediately following the overruling of the demurrer, a response, subject to the special appearance to contest jurisdiction was filed, which squarely raised the constitutional question treated in the majority opinion, after which the court continued the hearing until petitioner, who had thus far appeared only by his attorneys, was physically present, and ordered the immediate issuance of a body attachment for petitioner.

The question of the validity of the service of the citation on petitioner is just as important to the jurisprudence of this state and its administration of justice as the question treated in the opinion. In my opinion, there was nothing to be decided in the trial court until this issue was properly disposed of, and there is nothing before this court until the threshold question of jurisdiction has been determined. The special appearance was strictly limited to the question whether the service of the citation was sufficient to permit the court to act in the case. The other questions were presented subject to that appearance and the consequent jurisdictional question and properly so. I cannot believe that the majority, by circumvention, is implying that this service is valid. If so, I disagree. If not, then I submit that the majority opinion is an advisory one, is dictum, and of no binding effect, for want of jurisdiction, for if the trial court had no jurisdiction we have none, and nothing should be done except quash the service and the order punishing petitioner and dismiss him from further answer.

First, we cannot overlook the fact that criminal, not civil, contempt is involved. A criminal contempt proceeding is one brought to preserve the power and dignity of the court, while a civil contempt proceeding is one instituted to preserve and enforce rights of private parties to a suit and to compel obedience to orders and decrees made for the benefit of such parties. *Blackard* v. *State,* 217 Ark. 661, 232 S.W. 2d 977. It is commonly held that, in a proceeding for criminal contempt, the contemnor is entitled to all the safeguards surrounding criminal prosecutions. *DeParcq* v. *United States District Court for Southern District,* 235 F. 2d 692 (8th Cir. 1956). See also, *Gompers* v. *Buck's Stove & Range Co.,* 221 U.S. 418, 31 S. Ct. 492, 55 L. Ed. 797 (1911); *Michaelson* v. *United States,* 266 U.S. 42, 45 S. Ct. 18, 35 A.L.R. 451, 69 L. Ed. 162 (1924); *Parker* v. *United States,* 153 F. 2d 66, 163 A.L.R. 379 (1st Cir. 1946); *Wakefield* v. *Housel,* 288 F. 712 (8th Cir. 1923); *In re Nevitt,* 117 F. 448 (10th Cir. 1902); *Swanson* v. *Swanson,* 10 N.J. Super. 513, 77 A. 2d 477 (1950), aff'd 8 N.J. 169, 84 A. 2d 450 (1951). We have clearly recognized and applied these principles when we held that proof of guilt of a charged criminal contempt must be beyond a reasonable doubt. *Blackard* v. *State,* supra.

In holding that prosecutions for criminal contempts are subject to constitutional guaranties of jury trial, the United States Supreme Court, in *Bloom* v. *Illinois,* 391 U.S. 194, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968), had this to say:

Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both. In the words of Mr. Justice Holmes:

"These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech." Gompers v. United States, 233 US 604, 610, 58 L. Ed. 2d 1115, 1120, 34 S Ct 693 (1914).

Criminally contemptuous conduct may violate other provisions of the criminal law; but even when this is

not the case convictions for criminal contempt are indistinguishable from ordinary criminal convictions, for their impact on the individual defendant is the same. Indeed, the role of criminal contempt and that of many ordinary criminal laws seem identical— protection of the institutions of our government and enforcement of their mandates.

Because of the close analogy to a criminal proceeding, the process by which a criminal contempt proceeding is initiated must be served within the state in which the proceeding is commenced in order to clothe that court with jurisdiction to decide the charge of contempt. *Swanson* v. *Swanson,* supra; *Brown* v. *Brown, 96* N.J. Eq. 428, 126 A. 36 (1924); *In re Lavin,* 59 Idaho 197, 81 P. 2d 727 (1938).

We have clearly recognized the necessity for personal service in criminal contempt proceedings. In *Hudkins* v. *Arkansas State Board of Optometry,* 208 Ark. 577, 187 S.W. 2d 538, the petitioners sought review of their punishment for contempt for wilfully violating previous injunctive orders of a chancery court. See *Ritholz* v. *Arkansas State Board of Optometry,* 206 Ark. 671, 177 S.W. 2d 410. This is criminal contempt. See Ark. Stat. Ann. § 34-901 (Repl. 1962). In *Hudkins,* we stated that since Ritholz, one of the parties who was enjoined in the original proceedings, was in a foreign jurisdiction he could not be reached for punishment. Later in *Ritholz* v. *Dodge,* 210 Ark. 404, 196 S.W. 2d 479, we repeated the proposition that the Arkansas court was powerless to compel the physical presence of an alleged contemnor for punishment, even though the court, by service on the manager of the store owned and operated by the nonresident partners in violation of the court's orders, did have jurisdiction to subject the property of the nonresidents used in violation of the court's injunction to the satisfaction of a fine imposed for the violation.

I would quash the order punishing petitioner for contempt for failure to appear upon the citation because of the invalidity of the service.

The other phase of the case should be simply disposed of. We have held that where it does not appear from the record that the suspension is a mere postponement of sen-

tence, the suspension operates as a complete remission in cases of criminal contempt. *Johnson* v. *Johnson,* 243 Ark. 656, 421 S.W. 2d 605; *Stewart* v. *State,* 221 Ark. 496, 254 S.W. 2d 55. Actually, the principal reason given in *Stewart* for declaring that such a suspension as was made here amounted to complete remission was the lack of authority for an indefinite suspension in contempt cases. In *Johnson* we said that there was no basis for appellate relief in such a case. In *Turpy* v. *State,* 234 Ark. 821, 354 S.W. 2d 728, we quashed a suspended sentence in a contempt proceeding because it amounted to a complete remission. We should do the same here.

If, then, the order fixing petitioner's punishment for failure to appear in response to the citation should be quashed because the court had no jurisdiction over the person of petitioner, as I feel sure the majority would agree, and if the suspended punishment is a complete remission of the contempt charge based on the publication of the jury verdict so that it could be quashed, I am unable to conceive of any reason for the eagerness of the court to go wading in the constitutional quagmire which has arisen on the question of appropriate balance between the equally cherished constitutional guaranties of free press and fair trial, as it has. I can only repeat my dissent in *Grimmett* v. *State,* 251 Ark. 270-A, 476 S.W. 2d 217, wherein I pointed out that: this court said for more than 75 years that courts *do not* and *should not* pass upon constitutional questions unless the answers to those questions are so *necessary* to a determination of the case that it *cannot* otherwise be decided; decisions of the court on constitutional questions under such circumstances are pure dictum; when an appeal can be disposed of without determining the constitutional question it is our *duty* to do so; constitutional questions are *never* decided unless necessary because the case *cannot* be disposed of on any other ground. On the same date as we handed down our opinion in *Grimmett* this court, in *Board of Equalization* v. *Evelyn Hills Shopping Center,* 251 Ark. 1055, 476 S.W. 2d 211, said:

> We do not reach the constitutional arguments here made because the trial court after lapse of the October 1970 term of court had no jurisdiction to amend the

judgment to grant any additional relief. In St. Louis & N. A. Rd. Co. v. Bratton, 93 Ark. 234, 124 S.W. 752 (1910), we pointed out that there is no authority after term time for a trial court, under the guise of an amendment, to revise a judgment to adjudicate a matter which might have been considered at the time of the trial or to grant an additional relief not in contemplation of the court at the time the judgment was entered. This in accord with our long standing rule that constitutional issues will not be determined unless their determination is essential to disposition of the case, Martin v. State, 79 Ark. 236, 96 S.W. 372 (1906), and Bell v. Bell, 249 Ark. 959, 462 S.W. 2d 837 (1971).

See also, *Satterfield* v. *State*, 245 Ark. 337, 432 S.W. 2d 472, and *Searcy County* v. *Stephenson*, 244 Ark. 54, 424 S.W. 2d 369. Our language in those cases was positive and unequivocal, admitting of no exceptions. I had thought that *Grimmett* might be an aberration that would not be indicative of the future course of this court. I had not the slightest idea that it indicated an overruling of what this court has called an unvarying rule.

A reading of the opinions in *Grimmett* might lead to the conclusion that the real difference between the majority and the dissenters lay in the basic premise of the dissenting opinion, i.e., that there had been no evidence of a law violation by Grimmett. If there was, the constitutional question was properly approached. If not, it was not. The apparent departure could easily be explained in this way, and seems more plausible than the notion that the court did not intend to abide by its wholesome rule.

I submit that our long standing rule is appropriate and that deviations from it presage nothing except additional burdens and additional troubles to plague the judiciary and the judicial system. If all courts had exercised appropriate judicial restraint and not gleefully seized upon the earliest opportunity to decide grave constitutional questions, this nation might not be enveloped in a state of constitutional flux which all too often seems to be the product of judicial opinions.

I further submit that the majority opinion is contrary to an authority upon which it relies. *United States* v. *L. Dickinson & G. Adams*, 465 F. 2d 496 (5th Cir. 1972), does not foreclose the possibility that special exigencies might justify curtailment of publication of court proceedings in extraordinary circumstances constituting an immediate danger to the administration of justice.[1] There the court only considered a blanket ban on publication. But more important is that court's holding that an order of a court having both subject matter and personal jurisdiction must be obeyed even though invalid for constitutional reasons and that one may be punished for contempt of court for disobedience of a court order, regardless of the unconstitutionality of the underlying order. The Fifth Circuit Court of Appeals remanded that case for a determination whether the judgment of contempt or the punishment would still be deemed appropriate in light of the constitutional infirmities of the order.

The rule stated in *Martin* v. *State*, 162 Ark. 282, 257 S.W. 752, cited by the majority is in complete accord with the Fifth Circuit holding. This very statement in the majority opinion points up the necessity for the court to meet, not by-pass, the jurisdictional question.

I also suggest that, if the action of the trial judge in seeking to postpone publication of the jury verdict was improper, and if the court feels compelled to afford guidance to circuit courts for the handling of future problems where contamination of a trial and verdict by publication of results in related cases is probable, we could better accomplish the purpose by the exercise of our rule-making power. We have furnished no guide here, and it would really not have been appropriate to use the vehicle of this judicial opinion for establishment of guidelines for all such cases. A simple rule could guide the trial courts in their handling of jury verdicts in future cases.

I would also quash the contempt judgments, as hereinabove indicated.

---

[1]See also, concurring opinion of Mr. Justice White in *Branzburg* v. *Hayes*, 408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (40 USLW 5025) footnoted in the *Dickinson-Adams* opinion.