State of Nebraska, appellee, v. Erwin Charles Simants, appellee, Nebraska Press Association et al., applicants-appellants.
State of Nebraska ex rel. Nebraska Press Association et al., Relators, v. The Honorable Hugh Stuart, Judge, District Court of Lincoln County, Nebraska, respondent, Erwin Charles Simants, intervener-respondent, State of Nebraska, intervener-respondent.

236 N. W. 2d 794

Filed December 1, 1975. Nos. 40445, 40471.

Maupin, Dent, Kay, Satterfield, Girard & Scritsmeier and McGill, Koley & Parsonage, for applicants-appellants.

Paul L. Douglas, Attorney General, for appellee State.

Keith N. Bystrom and Leonard P. Vyhnalek, for appellee Simants.

Stephen T. McGill of McGill, Koley & Parsonage, for relators.

Paul L. Douglas, Attorney General, Harold Mosher, and Melvin K. Kammerlohr, for respondent Stuart.

Keith Bystrom and Beatty, Morgan & Vyhnalek, for intervener-respondent Simants.

Milton R. Larson, for intervener-respondent State.

Heard before White, C. J., Spencer, Boslaugh, McCown, Newton, Clinton, and Brodkey, JJ.

Per Curiam.

At issue in these cases is the resolution of an apparent

conflict between the guarantees of the First and Sixth Amendments to the Constitution of the United States. This court is called upon to draw an accommmodation between these two "preferred" amendments which will preserve the right to a fair trial without abridging freedom of the press. The issue is laid before us in case No. 40471, by the relators, television, newspaper, and other media organizations and personnel, who seek through an original action a writ of mandamus which will compel the respondent District Court Judge for Lincoln County to vacate a restrictive order relating to the publication of pretrial publicity in State v. Simants, case No. 40445.

On October 18, 1975, six members of a family were found dead of gunshot wounds in their home at Sutherland, Nebraska. On October 19, 1975, Erwin Simants was charged with six counts of murder in the first degree, arraigned, and counsel was appointed for him. A preliminary hearing was set for October 22, 1975. On October 21, 1975, the prosecuting attorney filed a motion for a restrictive order with the county court, requesting the court to restrict publication of testimony to be presented at the preliminary hearing. A hearing on the motion was held that same evening. Attorneys representing the State, Simants, and the media were present. Attorney for the defendant advised the court that Simants consented to the State's motion to restrict publication of testimony from the preliminary hearing and further made an oral motion requesting that the restrictive order be broadened to close the preliminary hearing to the public and press. After arguments by counsel, the court found the State's motion should be sustained.

On October 22, 1975, prior to the preliminary hearing, the county court entered a restrictive order. The order precluded all parties involved in the preliminary hearing as well as the "news media" from releasing "for public dissemination in any form or manner whatsoever any testimony given or evidence adduced during the prelimin-

ary hearing." The order also contained additional restrictive provisions apart from the preliminary hearing. Finally, the court denied Simants' motion requesting a closed hearing.

On October 22, 1975, the preliminary hearing was held on an amended complaint which charged six counts of murder in the first degree and further alleged that the murders were committed in the perpetration of or attempt to perpetrate one or more sexual assaults. After testimony from several witnesses and the introduction of other evidence, Simants was bound over to District Court to stand trial.

On October 23, 1975, attorneys representing the persons who are now the relators in the mandamus action, case No. 40471, filed an application requesting the right to be heard on a challenge to the constitutionality of the restrictive order entered by the county court. The District Court granted petitioners' motion to intervene. On that same day, October 23, 1975, Simants filed a motion for a continuation of the county court's restrictive order with respect to pretrial publicity. On October 27, 1975, the District Court acted on defendant's motion. It terminated the county court's order and imposed its own restrictions on dissemination of pretrial publicity emanating from the case. The District Court adopted, with some clarifications, the standards set out in The Nebraska Bar-Press Guidelines for Disclosing and Reporting of Information Relating to Imminent or Pending Criminal Litigation. These standards, together with the accompanying clarifications, precluded the media from reporting on most of the testimony and some other evidence presented at the preliminary hearing.

Relators sought relief in this court from the October 27, 1975, restrictive order imposed by the District Court via two procedural routes. On October 31, 1975, relators instituted a section 25-1912, R. R. S. 1943, appeal from the District Court order and at the same time petitioned this court for leave to file an original action

in the nature of a writ of mandamus requesting this court to vacate the October 27, 1975, restrictive order. While relators' appeal and request to docket an original action in this court were pending, they petitioned Mr. Justice Blackmun of the United States Supreme Court, asking him as Circuit Justice to stay the October 27, 1975, District Court order under Title 28 U. S. C., sections 2101(f) and 1257(3). Thereafter, this court on November 10, 1975, issued a per curiam memorandum in which we noted that relators were seeking concurrent relief from both the United States Supreme Court and this court and we therefore declined to take action on the petition for a writ of mandamus so long as we were in the position of exercising parallel jurisdiction with the Supreme Court of the United States. We continued action on the matter until the United States Supreme Court made known whether it would accept jurisdiction in the matter.

On November 13, 1975, Mr. Justice Blackmun, in his capacity as Circuit Justice, issued a chambers opinion in which he noted his desire to refrain from issuing or denying a stay on the restrictive order until this court had an opportunity to act on the same.

On November 18, 1975, this court set November 25, 1975, as the date on which we would hear relators' arguments on their request for an original action as well as on the substantive questions surrounding the constitutionality of the restrictive order. Relators thereafter filed a reapplication for a stay with Mr. Justice Blackmun.

On November 20, 1975, Mr. Justice Blackmun handed down a chambers opinion in which he granted relators a partial stay on the October 27, 1975, order.

On November 24, 1975, the Lincoln County attorney and defendant's attorney filed petitions in intervention with this court requesting to be heard at the November 25, 1975, hearing. The petitions were granted and a full hearing was held before this court on that date.

On November 25, 1975, this court, despite the intervening order of Mr. Justice Blackmun, heard oral arguments in both cases before us insofar as they pertain to the request for a stay of the restrictive order of the District Court. After Mr. Justice Blackmun issued his order the media, not being satisfied therewith, invoked the jurisdiction of the Supreme Court' of the United States and asked it to vacate the portion of the trial court's restrictive order not vacated by Mr. Justice Blackmun. If we were to be entirely consistent we ought now to again refrain from acting because we are now in the position of exercising concurrent jurisdiction with the United States Supreme Court for which there is no precedent. Nonetheless, despite the regrettable possibility of collision, there are important questions of procedure and standing which need definition by us and which relate only to state procedures. In addition, the trial courts of this state are in need of some guidance from us in the matter at issue and which may not be otherwise forthcoming. Additionally, as Mr. Justice Blackmun appropriately notes, the question of the jurisdiction of the Supreme Court of the United States in this matter is "not without difficulty" because there has been no order, final or otherwise, by this court. That "difficulty" ought to be removed. So we proceed to determine the matter before us on the merits insofar as the request for the stay of the District Court order is concerned.

The first question we must decide is that of our own jurisdiction in case No. 40471, the original action of mandamus. We have jurisdiction in an original action of mandamus if the order of Judge Stuart of October 27, 1975, is in whole or in some significant part wholly void. State ex rel. Reynolds v. Graves, 66 Neb. 17, 92 N. W. 144. We conclude, for reasons hereinafter stated, that the order is in part void and so affirm or grant permission to the relators to file the original action.

The next question before us is whether the relators

had standing to intervene in State v. Simants, case No. 40445. No third party has any right to intervene in a criminal prosecution. The matter at issue in such cases is the guilt or innocence of the accused. In legal contemplation no third party "has or can claim an interest in the matter in litigation, in the success of either of the parties to [the] action, or against both." This is the standard applicable to the right to intervene. § 25-328, R. R. S. 1943. See State v. Berry, 192 Neb. 826, 224 N. W. 2d 767. Accordingly, the appeal in case No. 40445 is dismissed.

The restrictive order of Judge Stuart of October 27, 1975, insofar as we need to set it forth is in summary as follows: It applies only to pretrial publicity and terminates when the jury is impaneled to try the case of State v. Simants. It applies only to the relators. It incorporates generally as a standard for reporting certain voluntary Nebraska Bar-Press Guidelines for Disclosing and Reporting of Information Relating to Imminent or Pending Criminal Litigation. It prohibits the publication of the fact, if any, or the contents of confessions or admissions against interest or statements made by the accused to law enforcement officials. It prohibits the publication of the fact, if any, or the contents of statements against interest made to certain named individuals. It prohibits the publication of the nature of the probable testimony of certain named witnesses, and certain aspects of the testimony of another named witness. It prohibits the publication of the identity of a person or persons allegedly sexually assaulted. It prohibits the publication of the exact nature of the limiting order and prohibits reference to the contents of two specific paragraphs of the order.

We now proceed to our resolution and accommodation of the two conflicting constitutional rights and introduce that resolution with quotation from "Statement on Matters of Joint Concern to the Bench, the Bar, Law Enforcement Officers, and the News Media" contained

in the ABA Standards Relating to Fair Trial and Free Press, p. 16: "(a) *General.* Freedom of speech and of the press are fundamental liberties guaranteed by the United States Constitution. They must be zealously preserved, but at the same time must be exercised with an awareness of the potential impact of public statements on other fundamental rights, including the right of a person accused of crime, and of his accusers, to a fair trial by an impartial jury.

"(b) *The need to inform the public.* It is important both to the community and to the criminal process that the public be informed of the commission of crime, that corruption and misconduct, including the improper failure to arraign or to prosecute, be exposed whenever they are found, and that those accused of crime be apprehended. If, however, public statements and reporting with respect to these matters assume the truth of what may be only a belief or a suspicion, they may destroy the reputation of one who is innocent and may seriously endanger the right to a fair trial in the event that formal charges are filed.

"(c) *From the time of arrest or the filing of charges to the beginning of trial.* A man who has been arrested, for whom an arrest warrant has been issued, or against whom a criminal complaint, information, or indictment has been filed, has only been charged with the commission of crime. He is entitled under the Constitution to a fair and impartial trial, in which he is presumed innocent until proved guilty by competent evidence. Thus during the period prior to trial, public statements originating from officials, attorneys, or the news media that assume the guilt of the person charged, that include inaccurate or inadmissible information, or that serve to inflame the community, may undermine the judicial process by making unobtainable a jury satisfying the requisite standard of impartiality. Alleged facts may be untrue, confessions obtained or evidence seized may be inadmissible in evidence, prior criminal records will be

inadmissible except under limited circumstances and for restricted purposes, and witnesses may substantially modify their stories under oath or after confrontation by the accused or cross-examination. The right to a fair trial may thus be substantially endangered by public statements or by reporting prior to trial going beyond a factual description of the person arrested and of the crime charged and a factual statement of the arrest and surrounding circumstances. The danger is especially acute when public statements or reporting extend to such matters as confessions or admissions, prior history, or the performing of tests or refusal to submit to a test; opinions about guilt or innocence; interviews of prospective witnesses; interviews of the defendant before he has had an opportunity to consult with counsel; and speculation as to the plea to be entered or the evidence or testimony to be introduced at the trial. The release and publication of photographs when identification is a matter in dispute may cause particular difficulty, as may reiteration of any earlier detailed reports as the time of trial approaches."

The constitutional guarantees of freedom of speech and of the press and of the right of trial by an impartial jury are, in our judgment, the same under both the Constitutions of this state and of the United States and there is no need to differentiate between the two Constitutions in this discussion.

"The First Amendment freedoms are not ends in themselves, but only means to the end of a free society. . . . The First Amendment freedoms are vital, but their exercise must be compatible with the preservation of other essential rights. Application of the First Amendment can no more be governed by absolute rules than can that of other constitutional provisions." Schwartz on Constitutional Law, § 135, p. 251. The rights which are guaranteed by the First Amendment to the United States Constitution and the right to trial by an impartial jury guaranteed by the Sixth Amendment are both

"preferred" rights. Schwartz, op cit, § 111, p. 193. The Constitution makes no hierarchy of rights. Brinegar v. United States, 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949), Mr. Justice Jackson dissenting at p. 180.

The Supreme Court of the United States has not yet had occasion to speak definitively where a clash between these two preferred rights was sought to be accommodated by a prior restraint on freedom of the press. There are, however, some statements in various opinions which lead to the conclusion that under some circumstances prior restraint may be appropriate. In Branzburg v. Hayes, 408 U. S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972), where the claimed right of a newsman not to be compelled to testify before a grand jury was denied, Mr. Justice White, in the majority opinion said: "The prevailing view is that the press is not free to publish with impunity everything and anything it desires to publish. . . . Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal. In Sheppard v. Maxwell, 384 U. S. 333 (1966), for example, the Court reversed a state court conviction where the trial court failed to adopt 'stricter rules governing the use of the courtroom by newsmen as Sheppard's counsel requested,' neglected to insulate witnesses from the press, and made no 'effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides.' Id. at 358, 359. . '[T]he trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which di-

vulged prejudicial matters.' Id., at 361." The statement immediately preceding the citation of Sheppard v. Maxwell is, however, dicta as no issue of prior restraint was actually involved in the Sheppard case. There are also implications in other opinions that prior restraints may be imposed and it is also clear that the Supreme Court of the United States has never said, in the context with which we are here concerned, that such restraints may never be imposed when necessary to assure trial by an impartial jury. See Irvin v. Dowd, 366 U. S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751, Mr. Justice Frankfurter, concurring, at p. 729. In Pennekamp v. Florida, 328 U. S. 331, 66 S. Ct. 1029, 90 L. Ed. 1295, Mr. Justice Reed said: "Free discussion of the problems of society is a cardinal principle of Americanism—a principle which all are zealous to preserve. Discussion that follows the termination of a case may be inadequate to emphasize the danger to public welfare of supposedly wrongful judicial conduct. It does not follow that public comment of every character upon *pending trials* or legal proceedings may be as free as a similar comment after complete disposal of the litigation. Between the extremes there are areas of discussion which an understanding writer will appraise in the light of the effect on himself and on the public of creating a clear and present danger to the fair and orderly judicial administration. Courts must have the power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." (Emphasis supplied.) In New York Times Co. v. United States, 403 U. S. 713, 91 S. Ct. 2140, 29 L. Ed. 2d 822, it is said in a case not

involving personal conflicting constitutional rights that a prior restraint on the media bears "a heavy presumption against its constitutional validity." This same statement has been made by the Supreme Court of the United States in other cases. The implication of such statement is that if there is only a presumption of unconstitutionality then there must be some circumstances under which prior restraints may be constitutional for otherwise there is no need for a mere presumption.

None of the cases in which the United States Supreme Court has used language which imports an absolutist view of the First Amendment free speech right involves a conflict between two fundamental or preferred constitutional rights. In Bridges v. State of California, 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192, Mr. Justice Black noted the difficulty of resolving conflicts between the rights of free speech and fair trial and said: ". . . free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." In Cox Broadcasting Corp. v. Cohn, 420 U. S. 469, 95 S. Ct. 1029, 43 L. Ed. 2d 328, the conflict was between freedom of the press and a claimed right of personal privacy which was, under the circumstance, clearly not a constitutional right. See, also, Craig v. Harney, 331 U. S. 367, 67 S. Ct. 1249, 91 L. Ed. 1546 (misconduct); Near v. Minnesota ex rel. Olson, 283 U. S. 697, 51 S. Ct. 625, 75 L. Ed. 1357 (misconduct).

It is, of course, absolutely clear that the purpose of freedom of the press is not to determine the outcome of litigation by newspaper publicity, although unfortunately on some occasions it has been so used. Sheppard v. Maxwell, 384 U. S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600; State v. Lovell, 117 Neb. 710, 222 N. W. 625; Irvin v. Dowd, *supra*; Rideau v. Louisiana, 373 U. S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663.

The relators take an absolutist position so far as freedom of the press is concerned and state that, even

if in some cases because of the exercise of freedom of the press pretrial publicity was such that trial by an impartial jury became impossible, it is better that an accused go free than that freedom of the press be impinged even in the slightest degree. They say: "Petitioners would initially point out that the irreparable injury in such a situation is not that defendant will be incarcerated on the basis of an unfair trial; *the injury . . . is to society as a whole, which, due to the impossibility of a defendants obtaining a fair trial, must necessarily forego a conviction of a person who may well have committed the crime for which he is charged.*" (Emphasis supplied.)

In the preface of its restrictive order the District Court found "there is a clear and present danger that pre-trial publicity could infringe upon the defendant's right" to be tried by an impartial jury, that is, as we see it, by 12 persons who have not already made up their minds as to the defendant's guilt or innocence. It is, of course, the constitutional right of a defendant to rely upon the presumption of innocence which the law gives and to require the State to prove that he (1) committed the act charged and (2) his legal culpability, if that is also an issue.

We have earlier referred to the principle that orders imposing prior restraint bear a heavy presumption of unconstitutionality. Does the evidence in the court below support the court's finding so as to overcome the heavy presumption of unconstitutionality of the prior restraint? The trial court in the preface to its restrictive order found that there was a clear and present danger that pretrial publicity could substantially impair the right of the defendant to a trial by an impartial jury unless restraints were imposed. Does that evidence clearly indicate that the obligation of this state under the Constitutions of the United States and of this state to afford the accused a trial by an impartial jury may be impaired by pretrial publicity? The relators

argue that there is no evidence to support the finding because there was no hearing at which they were represented and because no evidence was actually received by the county court at its hearing. Both assertions are true, but it is not the order of the county court which is under attack here.

We are confronted with two separate questions. The first is the question of the jurisdiction of the District Court over the persons of the relators. The second is the sufficiency of the evidence to support the necessity of an order imposing some prior restraints, assuming that prior restraint in any degree is constitutional. We first deal with the question of jurisdiction.

The relators, by their motion to intervene in State v. Simants invoked and submitted themselves to the jurisdiction of the District Court. Their motion was granted (erroneously, as we have previously indicated), nonetheless, at that time the District Court acquired jurisdiction over the persons of the relators. They were heard and evidence was received. The District Court then temporarily adopted as its own the previous order of the county court and later adopted its own modified order. It is that order which is before us for examination. Relators point out, quite properly we believe, that "a judgment entered without jurisdiction of the person or the subject matter or in excess of the court's power is void and may be collaterally impeached." Woods v. Goodson, 253 Ark. 196, 485 S. W. 2d 213. It seems clear enough that the county court had no jurisdiction over the persons of the relators. The order of the county court was void for lack of jurisdiction of the person. That order purports to restrain "the news media." The courts have no general power in any kind of case to enjoin or restrain "everybody." Even when acting with jurisdiction in proper cases, orders must pertain to particular persons or legal entities over whom the court has in some manner acquired jurisdiction.

The relators could have ignored the order, or, if they

wished to avoid the possibility of some effort by the court to start contempt proceedings, could have collaterally attacked the order in some manner as by mandamus or action for a declaratory judgment. Admittedly these latter courses would have been somewhat time consuming. Perhaps for that reason the relators sought to intervene directly in State v. Simants, which they did in the District Court. Their request was granted. Their appearance was not special, but general. These relators voluntarily submitted to the jurisdiction of the court and asked not only that the order be lifted, but also opposed the request of the defendant that certain pretrial proceedings be closed to the general public.

· We now turn to the circumstances under which the District Court entered its restrictive order. The evidence in the hearing before the District Judge consisted principally of the testimony of the county judge who had entered the prior order and copies of numerous news articles from newspapers printed or circulated in the county where the crime occurred. The record demonstrates clearly that even before the defendant was afforded a preliminary hearing which section 29-1607, R. S. Supp., 1974, and probably the Constitution of the United States, requires (see Gerstein v. Pugh, 420 U. S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54), certain of the newspapers had printed articles which contained hearsay information and purported statements of the counsel, which, if true, tended clearly to connect the accused with the slayings and which information, if true, was likely to be, or at least some of it would be, presented at the preliminary hearing. The items to which we refer were printed within articles of the October 20, 1975, issue of the North Platte Telegraph; the October 20, 1975, issue of the Lincoln Star; the October 21, 1975, issue of the Denver Post. This information, if obtained from official sources, would not under the provisions of item 1 of the guidelines under the heading "Information Generally Not Appropriate for Disclosure and Reporting"

be appropriate for reporting. The record shows that this was recognized by some of the media, but doubt was expressed that the voluntary guidelines would apply to a preliminary hearing. The District Court, therefore, could quite properly conclude that the evidence from the preliminary hearing, if it was in fact presented would have again been repeated by at least some of the relators. Those conclusions are reinforced by the fact that in open court at the hearing before the District Judge, counsel for the media stated that it is already doubtful that an unbiased jury can be found to hear the Simants case in Lincoln County. This statement of counsel was later reported in the October 23, 1975, issue of the North Platte Telegraph.

The concern of the prosecutor, the defense attorney, and the county judge that pretrial publicity might make it difficult or impossible for the State of Nebraska to afford Simants a trial before an impartial jury was not ill founded. Unless the absolutist position of the relators was constitutionally correct, it would appear that the District Court acted properly in restraining publication of certain information which might or may have been adduced at the preliminary hearing.

Section 29-1301, R. S. Supp., 1975, provides: "All criminal cases shall be tried in the county where the offense was committed, except as otherwise provided in sections 29-1301.01 to 29-1301.03 or section 24-903, or unless it shall appear to the court by affidavits that a fair and impartial trial cannot be had therein. In such a case the court may direct the person accused to be tried in some adjoining county." The laws of this state also provide that an accused must be tried within 6 months from the date of the filing of the information or be absolutely discharged. §§ 29-1205 et seq., R. S. Supp., 1974; State v. Alvarez, 189 Neb. 281, 202 N. W. 2d 604. Trial of the accused has now been set for January 5, 1976.

There are other factors which the District Court could properly take into consideration. The population of

Lincoln County, Nebraska, according to the 1970 census was 29,538. The populations, according to the same census of the adjacent counties to which venue might be changed are as follows:

| County | 1970 Population |
|---|---|
| Keith | 8,487 |
| Perkins | 3,423 |
| Hayes | 1,530 |
| Frontier | 3,982 |
| Dawson | 19,537 |
| Custer | 14,092 |
| Logan | 991 |
| McPherson | 623 |

The area in which the jury may be selected is served by several radio stations, two television stations, and several newspapers in addition to those specifically mentioned. Modern communications tend toward the saturation point in news coverage and so, as a practical matter, in some cases it is much more difficult to obtain an impartial jury than it once was. This is evidenced by the reported cases, Sheppard v. Maxwell, *supra;* Irvin v. Dowd, *supra*; Rideau v. Louisiana, *supra*. The mere heinousness or enormity of a crime is, of course, by itself, no reason at all for a prior restraint of freedom of the press, but certainly it is a matter which a court may take into consideration along with all the other factors involved. One of these factors is, of course, the trial court's own knowledge of the surrounding circumstances.

We now turn to discussion of the merits of the basic issue. That the press be absolutely free to report corruption and wrongdoing, actual or apparent, or incompetence of public officials of whatever branch of government is vastly important to the future of our state and nation cannot be denied as anyone who is familiar with recent events must be well aware. Prior restraint of the press, however slight, in such instances is unthinkable. Near v. Minnesota ex rel. Olson, *supra*. In these

instances and many others no preferred constitutional rights collide.

In cases where equally important constitutional rights may collide then it would seem that under some circumstances, rare though they will be, that an accommodation of some sort must be reached. It is difficult to accept the relators' position that the press in such cases must be completely unrestrained even if the cost is that a criminal cannot be tried. It is also difficult to accept the proposition that an accused may not be irreparably harmed by wrongful incarceration. Sheppard v. Maxwell, *supra*, is a case in point. Defendant's guilt was doubtful. Defendant's conviction was accomplished, as the opinion of the Supreme Court of the United States indicates, almost wholly because of a concededly outrageous exercise of freedom of the press. The defendant served 10 years of his sentence until his conviction was overturned and a new trial granted. The subsequent finding of not guilty can scarcely be said to have made the injuries suffered by the incarceration reparable. This comment, of course, is not to suggest that the reporting in this case was or is even likely to be anything like that referred to in Sheppard v. Maxwell, *supra*. The press, in fact, appears to have followed the voluntary guidelines to which they apparently were parties.

It is not, however, the accused alone who has a large stake in the constitutional right of trial by an "impartial jury." Society as a whole has just as great a stake. This is true not only because each member of the public might some day need to exercise his own right of trial by jury, but because the United States and each state of the Union have the obligation under the Constitution to assure every accused of a trial by an impartial jury.

The extremist and absolutist position of the relators assumes too much. Society as a whole loses a great deal when a criminal has to go free because he cannot be tried. The same thing is true in the case where an innocent person may be convicted because an impartial

jury cannot be obtained. In such cases the true criminal has gone free.

In cases where such things as this are likely to occur the constitutional right of a free press comes into direct conflict with the obligation of the state under the United States and state Constitutions to assure an accused of a trial by an impartial jury. First Amendment rights other than freedom of the press and of speech are not absolute. Freedom of religion is one of the First Amendment rights. Yet religious belief cannot be pleaded as justification for criminal action. Davis v. Beason, 133 U. S. 333, 10 S. Ct. 299, 33 L. Ed. 637. The constitutional guarantee does not permit the practice of polygamy on the basis of religious belief. Reynolds v. United States, 98 U. S. 145, 25 L. Ed. 244.

The absolutist position of relators assumes that each and every exercise of freedom of the press is equally important and significant and that any impingement whatever may be equally disasterous for our state and nation. Such a position cannot, we believe, be supported. Near v. Minnesota ex rel. Olson, *supra,* and Sheppard v. Maxwell, *supra,* are examples of the wide disparity of importance. The absolutist position assumes there can be no degree of values for the particular right in which the absolutist has a special interest. It assumes that all other constitutional rights are somehow inferior and that impingement upon his right will ultimately lead to tyranny. The fact that our awareness of recent political history makes us extremely conscious of our great debt to a free press ought not to lead us to disparage other equally cherished personal rights, merely because, in this case, the right, trial by an impartial jury, need not be exercised by all persons. Nor should it lead us to disregard the stake all have in the exercise of that right by those who choose to or must exercise it.

We are cognizant of the possibility that this very court may be called upon in the near future to judge the fairness of Simants' trial. We ought not to take

action here which will in any measure jeopardize that ultimate fairness or put this court in the position of making prejudgments.

We conclude that the order of the District Court of October 27, 1975, is void insofar as it incorporates the voluntary guidelines and in certain other respects in that it impinges too greatly upon freedom of the press. The guidelines were not intended to be contractual and cannot be enforced as if they were.

The order of the District Court of October 27, 1975, is vacated and is modified and reinstated in the following respects: It shall be effective only as to events which have occurred prior to the filing of this opinion, and only as it applies to the relators herein, and only insofar as it restricts publication of the existence or content of the following, if any such there be: (1) Confessions or admissions against interest made by the accused to law enforcement officials. (2) Confessions or admissions against interest, oral or written, if any, made by the accused to third parties, excepting any statements, if any, made by the accused to representatives of the news media. (3) Other information strongly implicative of the accused as the perpetrator of the slayings.

One other aspect of this case requires our attention. Counsel for Simants asked the court below to close to the public, including the press, such of the pretrial proceedings as might be necessary to insure the empaneling of an impartial jury. This request the District Court denied. Relators point out that section 24-311, R. S. Supp., 1974, provides that all judicial proceedings shall be open. State and Simants respond that the statute, if construed to apply to all pretrial proceedings, irrespective of how disclosures during such proceedings might affect Simants' right to be tried by an impartial jury and affect the duty of the State to assure such impartial jury, is then unconstitutional. We have a duty to construe statutes to make them constitutional if possible. ABA Standard 3.1, Fair Trial and Free Press, in

our judgment supplies an applicable standard for such construction. We, therefore, vacate the order in case No. 40471 and direct the District Court to consider any applications the State or the accused may make for closed pretrial proceedings in future instances in accord with the following standard which we adopt. ABA Standard 3.1, Fair Trial and Free Press: "Pretrial hearings. ...

"Motion to exclude public from all or part of pretrial hearing.

"In any preliminary hearing, bail hearing, or other pretrial hearing in a criminal case, including a motion to suppress evidence, the defendant may move that all or part of the hearing be held in chambers or otherwise closed to the public, including representatives of the news media, on the ground that dissemination of evidence or argument adduced at the hearing may disclose matters that will be inadmissible in evidence at the trial and is therefore likely to interfere with his right to a fair trial by an impartial jury. The motion shall be granted unless the presiding officer determines that there is no substantial likelihood of such interference. With the consent of the defendant, the presiding officer may take such action on his own motion or at the suggestion of the prosecution. Whenever under this rule all or part of any pretrial hearing is held in chambers or otherwise closed to the public, a complete record of the proceedings shall be kept and shall be made available to the public following the completion of trial or disposition of the case without trial. Nothing in this rule is intended to interfere with the power of the presiding officer in any pretrial hearing to caution those present that dissemination of certain information by any means of public communication may jeopardize the right to a fair trial by an impartial jury."

No. 40445. APPEAL DISMISSED.

No. 40471. ORDER VACATED AND REINSTATED AS MODIFIED.

CLINTON, J., dissenting.

After the issuance of the order of stay by Mr. Justice Blackmun as Circuit Judge, and since this matter was set for hearing in this court, the relators, we are reliably informed, have invoked the jurisdiction of the Supreme Court of the United States in an application to that court for full court action to overturn the portion of the order of the District Court for Lincoln County, Nebraska, sustained by the order of Mr. Justice Blackmun.

There is no precedent or authority for this court and the Supreme Court of the United States to exercise concurrent jurisdiction in matters relating to construction of the federal Constitution. Either we have jurisdiction in this case, or the Supreme Court of the United States has jurisdiction.

We have supervisory jurisdiction over the trial courts of this state. State ex rel. Reynolds v. Graves, 66 Neb. 17, 92 N. W. 144. I know of no precedent and none has been cited to us which gives to the United States Supreme Court the same supervisory jurisdiction over the trial courts of this state that it clearly has over the federal courts.

The jurisdiction of Mr. Justice Blackmun, as Circuit Judge, and the jurisdiction of the Supreme Court of the United States, as Mr. Justice Blackmun recognizes in his opinion, rest upon the provisions of section 1257(3), Title 28 U.S.C., under which "Final judgments or decrees rendered by the highest court of a State in which a decision could be had" may be reviewed "where any title, right, privilege or immunity . . . is claimed under the Constitution . . . of the United States." Mr. Justice Blackmun concluded that a final order had been made because our failure to announce a decision exceeded "tolerable limits."

I again point out, as we did in the order which set this matter for hearing, that the application of the relators was filed in this court late on Friday, October 31,

1975. So far as the writer of this opinion is aware, the application did not come to the attention of any member of this court until Monday, November 3, 1975, at which time we were engaged in the first of 6 days of oral argument in cases pending before us and already irrevocably scheduled.

This is a collegial court and no member of this court has any constitutional or statutory power to grant a stay of the type here requested. That power must be exercised by the court as a whole. Neither may we act upon the basis of telephone calls from counsel, or telegrams. Where factual matters must be reviewed, we must have before us a bill of exceptions containing the evidence expected to be reviewed.

Although an application to file an original action would not normally be considered until we sat at a regularly scheduled weekly consultation, nonetheless, in this particular case the matter was, in accord with our standing practice, assigned to one of the judges of this court on November 4, 1975, for the purpose of preparing a report and recommendation to be considered by the full court at special consultation on Monday, November 10, 1975. While that report was in the process of preparation, the relators on November 4 or 5, 1975, had filed with Mr. Justice Blackmun in Washington, D. C., the application for a stay. This intervening, and to us unanticipated occurrence, affected the content of the report and resulted in the Per Curiam order of continuance adopted by us on November 10, 1975.

On November 13, 1975, Mr. Justice Blackmun rendered his first opinion on his expectation that we would "act forthwith and without delay." On November 13, 1975, there was filed by the relators the bill of exceptions in case No. 40445 and for the first time we had before us something other than ex parte representations as to what had occurred in the trial court. On November 17, 1975, we entered an order permitting the filing of the original action and set for hearing on November 25,

1975, the application for stay both in the original action and the direct appeal and gave notice to all parties of the hearing.

Apparently both the relators and Mr. Justice Blackmun expected that we would act summarily without notice to all interested parties and without a hearing. We did not do so, I think for reasons that should be obvious.

Despite the fact that Mr. Justice Blackmun acted on November 20, 1975, we nonetheless held the hearing on November 25, 1975. All parties were heard. However, between November 20, 1975, and November 25, 1975, as I have already mentioned, the relators invoked the jurisdiction of the Supreme Court of the United States to overturn Mr. Justice Blackmun's stay. I believe the relators are estopped to claim that we still have jurisdiction.

Mr. Justice Blackmun indicated that the problem of the jurisdiction of the United States Supreme Court under section 1257, Title 28 U.S.C., is "not free from difficulty." We ought now to remove that difficulty. The circular state of affairs which has existed ought to come to an end.

The appeal of the relators in case No. 40445 should be dismissed on the ground they have no standing to intervene in a criminal prosecution. § 25-328, R. R. S. 1943; State v. Berry, 192 Neb. 826, 224 N. W. 2d 767.

The original action of the relators, case No. 40471, ought to be dismissed as improvidently granted because of the intervening jurisdiction in the Supreme Court of the United States.

WHITE, C. J., joins in this dissent.

SPENCER, J., concurring.

This case requires immediate resolution in this court. While I am in full agreement with the merits of the dissent, I join in the majority opinion to resolve the immediate controversy in this jurisdiction.

NEWTON, J., joins in this concurrence.