Willene HENRY and Rich Roth *v.* Mark Andrew EBERHARD

91-255 832 S.W.2d 467

Supreme Court of Arkansas
Opinion delivered May 11, 1992
[Rehearing denied June 15, 1992.]

338

*Debby Thetford Nye*, Chief Counsel, and *Bruce P. Hurlbut*, Asst. Chief Counsel of the Department of Human Services, for appellants.

No response from appellee.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Senior Asst. Att'y Gen., for intervenor State of Arkansas.

*David J. Manley*, of Legal Services of Arkansas, for amicus curiae Arkansas Advocates for Children and Families.

DONALD L. CORBIN, Justice. Appellants, Willene Henry and Rich Roth, appeal an order entered by Judge Crabtree of the Benton County Chancery Court holding them both in criminal contempt for interfering with a previous order of that court. Both appellants are employees of the Arkansas Department of Human Services (DHS). They assign five points of error in the proceedings below. We find no error and affirm.

This appeal revolves around the custody of a minor, Jeffrey Eberhard. This case involves a complex set of facts. There were originally two separate actions going on simultaneously, a divorce action in chancery court and a dependent and neglected action in juvenile court. The two cases were consolidated, so that all issues were determined in the divorce action in chancery court. Appellants were eventually held in contempt and appealed to this court. Appellee did not file a response brief to appellants' brief. We allowed the state to intervene in the appeal and the Attorney General filed a brief on the state's behalf. We also allowed the filing of a brief for the *amicus curiae*, Arkansas Advocates for Children and Families.

Jeffrey Eberhard's parents had a divorce hearing on February 14, 1991. At the conclusion of that hearing, which was conducted by Judge Huffman of the Benton County Chancery Court, the chancellor announced from the bench that he would grant the defendant, Mark Eberhard, a divorce. Included in that oral ruling was an award of custody of the couple's son, Jeffrey, to the plaintiff, Rebecca Eberhard. The chancellor announced that Mr. Eberhard's weekend visitation rights could begin on the upcoming Saturday, February 16, 1991. Because there was evidence at the divorce hearing that Mr. Eberhard had sexually abused Jeffrey, visitation was awarded subject to third-party supervision. These verbal rulings were not written and filed of record with the clerk until March 26, 1991.

On January 29, 1991, prior to the Eberhards' divorce hearing, appellant Henry had filed a petition for court ordered supervision of Jeffrey pursuant to the dependent and neglected provision of the Arkansas Juvenile Code. The juvenile judge, Judge Crabtree, issued an order on that same day restraining and enjoining Mr. Eberhard's contact with his son.

In an effort to realize the visitation rights verbally granted to Mr. Eberhard in the divorce proceeding, Judge Huffman first consulted Judge Crabtree and then vacated the restraining order issued in the juvenile court proceeding. Judge Huffman then consolidated the juvenile case with the divorce case so that the related issues of Jeffrey's custody and visitation could be resolved.

Before Mr. Eberhard's scheduled visitation with Jeffrey was to begin on February 16, 1991, appellant Henry placed Jeffrey in

the protective custody of DHS for seventy-two hours pursuant to Ark. Code Ann. § 12-12-509 (1987 & Supp. 1991). These actions prevented Mr. Eberhard from visiting his son as permitted by the chancellor in the divorce proceeding.

The contempt proceedings in question began when Judge Huffman issued an order for Henry, her supervisor Roth, and DHS attorney Ron McLaughlin, to appear in his court and show cause why they should not be held in contempt for interfering with the order granting visitation rights for the weekend of February 16, and 17, 1991. Judge Huffman then *sua sponte* recused from the case and transferred it to Judge Crabtree. Judge Crabtree held hearings on the show cause orders and, after issuing a couple of intermediate orders, issued the final order of contempt on May 23, 1991.

The order entered May 23, 1991, found that both Henry and Roth had knowledge of the verbal visitation order and that they both willfully violated that order by taking protective custody of Jeffrey on February 16, 1991. Mr. McLaughlin was not found to be in contempt. Initially, Henry was sentenced to ninety days in jail, with eighty days suspended upon the condition that she pay costs and attorney fees incurred by Mr. Eberhard in prosecuting her interference with the verbal visitation order. Roth's sentence was taken under advisement. On appellant's motion for reconsideration, the court issued another order which modified Henry's sentence so that only sixty days of the sentence was suspended; in addition, she was required to take a psychological examination, the results of which were to be reported to the court. The final order issued on May 23, 1991, affirmed Henry's sentence as per the previous order, fined Roth $250.00, and sentenced him to thirty days in jail, both of which were suspended for one year conditioned on full compliance with all orders of the court.

We note that none of the parties has raised the issue of the suspension of part of the sentence for contempt. However, because the suspension could possibly render this appeal moot, we address this preliminary issue. It is well-settled that suspension of a sentence for contempt is in effect a complete remission of the contempt. *Higgins* v. *Merritt*, 269 Ark. 79, 598 S.W.2d 418 (1980); *Johnson* v. *Johnson*, 243 Ark. 656, 421 S.W.2d 605 (1967); *Stewart* v. *State*, 221 Ark. 496, 254 S.W.2d 55 (1953).

When applying this rule concerning remission, we have indicated that when part of the sentence is suspended, the portion that was suspended is remitted but the remaining portion of the contempt still exists. *James* v. *James*, 237 Ark. 764, 375 S.W.2d 793 (1964).

 This appeal is therefore not rendered moot by the partial suspension of the sentences. Eighty days of appellant Henry's sentence were suspended and therefore remitted; however, the remaining ten days properly place the issues raised by appellant Henry before us on appeal. As appellant Roth's sentence was suspended conditionally for a specific period of time, we conclude this suspension amounted to a mere postponement of the contempt rather than a remission. *See Johnson*, 243 Ark. at 660, 421 S.W.2d at 607. Therefore, the issues raised by Roth are properly before us on appeal.

 The trial court did not state whether it was holding appellants in civil or criminal contempt. However, the record reveals that, in addition to the purpose of coercing appellants to comply with previous court orders, the sentences imposed were for the purpose of punishing appellants' deliberate interference with the court's order. Thus, this was both a civil and a criminal contempt proceeding. *See Fitzhugh* v. *State*, 296 Ark. 137, 752 S.W.2d 275 (1988).

 We apply the standard of review for criminal contempt because it, as well as the burden of proof, is stricter than that for civil contempt. In a criminal contempt proceeding, proof of contempt must exist in the trial court beyond a reasonable doubt. *Jolly* v. *Jolly*, 290 Ark. 352, 719 S.W.2d 430 (1986). On appellate review, we consider the evidence in the light most favorable to the trial court's decision concerning the contempt and affirm if there is substantial evidence to support its decision. *Arkansas Dep't of Human Servs.* v. *Clark*, 305 Ark. 561, 810 S.W.2d 331 (1991).

Appellants' first assignment of error is essentially a claim that there is insufficient evidence to support the findings of contempt. Appellants specifically claim it was error to hold them in contempt because they had no direct knowledge of the visitation order, and the charge against them, they did not willfully disobey the visitation order, and they acted in good faith

pursuant to an overriding responsibility to protect Jeffrey. Appellant Roth further argues that he is immune from being held in contempt because he acted in his official capacity as DHS supervisor. He relies on Ark. Code Ann. § 12-12-509 (1987), the protective custody provision of the Child Abuse Reporting Act in effect at the time Henry and Roth acted.

In the final order which consists of sixteen pages, Judge Crabtree set forth very detailed findings of fact and explained his reasoning for the conclusion that both appellants were in contempt. With respect to the issue of whether appellants had knowledge of the verbal visitation order, the chancellor found:

> In the pleadings the Defendants assert a lack of knowledge of the terms of Judge Huffman's Order. That simply is not true. Willene Henry quoted Judge Huffman's Order in her Affidavit completed on Saturday, February 16, 1991, and attached to the Petition for Court Ordered Supervision. She stated under oath, "That on February 14, 1991, Mr. Mark Eberhard was granted four hours visitation with Jeffrey Eberhard with a 'supervisor of his choice' " (quotations in original Affidavit). Throughout the hearing on contempt, Willene Henry and Rich Roth stated they removed Jeffrey Eberhard from the home because of the court-ordered visit and because she believed the visitation was going to occur. They both asserted they had no problem with the supervised visitation but with who the supervisor was going to be, i.e., Craig McNew's fifteen-year-old daughter.

With respect to the issue of whether appellants willfully violated the visitation order, the chancellor found:

> In her Affidavit, Henry stated that Rebecca Eberhard could no longer protect the child because the Court had ordered visitation and that she could possibly be found in contempt and incarcerated for refusing to follow the Court Order. Surely, Rebecca Eberhard could protect her child if the occasion arose that required protection. The Department has never alleged, except in the affidavit of February 16, 1991, that Rebecca Eberhard could not properly care for the child or protect the child. The Department has never asked the Court to remove the child from Rebecca

Eberhard's custody and place him in foster care. Again, it wasn't the supervised visit that agents of the Department disagreed with, but who was to supervise the visit. According to the testimony of Officer Jordan, Willene Henry stated they (presumably she and Roth as agents of DHS) did not like the Judge's decision and were going to take Jeffrey into custody. In addition, Willene Henry telephoned Mark Eberhard and stated he could not visit with the child because she had taken him into foster care and if he wanted visitation to call *her* Tuesday morning, as if the final decision was hers and not the Court's. Henry and Roth took Jeffery Eberhard into custody and placed him in foster care to circumvent the Order issued by Judge Huffman. It is clear that Henry and Roth intentionally violated Judge Huffman's February 14, 1991, Order.

There is substantial evidence in the record to support these findings. In fact, we need look no further than the testimonies of appellants during the contempt hearing to find the supporting evidence. At two different points during her testimony, Henry admitted that on the evening of February 16, 1991, she was aware that Mr. Eberhard was planning to visit Jeffrey on February 16, 1991, and that this visit was the result of an order issued by Judge Huffman. She testified further that she and appellant Roth made a joint decision to take Jeffrey into protective custody.

Roth testified that by the afternoon of Friday, February 15, 1991, he was aware that Judge Huffman had issued an order on the day before granting Mr. Eberhard visitation with Jeffrey. He stated that he and Henry were concerned for Jeffrey's welfare due to the upcoming court-ordered visitation, and confirmed Henry's testimony that the two of them made a joint decision to take protective custody of Jeffrey on February 16, 1991.

Appellants' testimonies regarding the willfulness of their actions taken in violation of the visitation order are corroborated by Bentonville Police Officer Kenneth Jordan. Officer Jordan accompanied Roth to Mrs. Eberhard's house to take custody of Jeffrey and testified that he overheard Henry say to Mrs. Eberhard that "they didn't agree with the decision of the Court, that Mr. Eberhard, or that the step-father, or father, had unsupervised [sic] visitation rights to the child."

■ The record is overflowing with substantial evidence to support the chancellor's findings that both appellants knew of the visitation order and willfully and deliberately violated that order by disobeying process and initiating the proceedings to take Jeffrey into protective custody. Accordingly, we cannot say he erred in holding both appellants in criminal contempt for the obviously deliberate interference with the visitation order.

In support of their first assignment of error, appellants claim they should not have been held in contempt because they acted in good faith pursuant to an overriding responsibility to protect children under Arkansas law. Appellants argue that, as they viewed the facts, Jeffrey was a previous victim of sexual abuse and was about to be placed in a situation of imminent peril. They believed he was in imminent peril because of the upcoming visitation by Mr. Eberhard, which appellants allege was to be supervised by the teen-aged daughter of a friend of Mr. Eberhard. Thus, in their professional opinion, Jeffrey was in a situation which warranted their actions. Appellants claim their actions in taking Jeffrey into protective custody were consistent with the Child Abuse Reporting Act and DHS policy. They further claim that the "duties and responsibilities placed on DHS to protect children are paramount" and that "the authority to act to immediately remove a child from a situation deemed by a DHS official to be one in which the child is in imminent peril must carry greater weight to override existing court orders." Appellants' view is summarized in their brief as follows, "Likewise, it is inconceivable that the duty of a DHS official would be tempered by the existence of a court order which might be in conflict with the removal of a child from a dangerous situation."

■■ Appellants' view of the relationship between the Child Abuse Reporting Act, DHS Policy, and the trial courts of this state is skewed. First, there is simply no evidence in the record to support the allegation that a teen-aged girl was going to supervise Mr. Eberhard's visit with Jeffrey. Thus, there was no "imminent peril" that would have justified appellants' actions. Second, appellants claim their actions were consistent with DHS policy, when in fact, their actions were inconsistent with DHS policy. If a situation similar to the one facing Jeffrey placed him in imminent peril, appellants had a duty to notify Judge Huffman of that fact during the divorce hearing. Appellant Henry testified

at that hearing. If she was so convinced that Mrs. Eberhard could not adequately protect Jeffrey from Mr. Eberhard, Henry should have so testified. She did not. There is nothing in the record to indicate the chancery court was ever notified of any substantiated reports of sexual abuse of Jeffrey. Furthermore, there is no evidence of compliance with the DHS policy requiring notification of the prosecuting attorney and law enforcement officials of a report indicating sexual abuse of a child. This failure to present this evidence to the chancery court and other authorities is in direct violation of statutory law and DHS Policy. *See* Ark. Code Ann. § 12-12-507(b) (1987); *Cundiff* v. *Crider*, 303 Ark. 120, 792 S.W.2d 604 (1990); DHS, Division of Children and Family Services, Policy Manual 1812.2.1; 1823.1.1.

The Child Abuse Reporting Act and DHS policies are designed to work with the trial courts of this state, not against the courts, as appellants claim. It is inconceivable to this court that appellants would view their determinations of a child's need for protection as above and beyond any order of a chancellor, especially when the chancellor was not given the benefit of DHS's knowledge of the substantiated reports of abuse as required by DHS policy.

The evidence reveals that appellant Henry started her investigation of Jeffrey's case in October 1990. She did not file the petition requesting Mr. Eberhard's restraint from Jeffrey until January 29, 1991. Mr. McLaughlin testified such a delay was unusual. The evidence further reveals that once aware of the visitation order issued February 14, 1991, for the weekend of February 16 and 17, 1991, appellant Henry again delayed her actions. She made no effort to contact Judge Huffman about her concern for the scheduled visitation. She most certainly could have received his attention by filing another petition or motion for reconsideration. She did nothing except initiate the protective custody proceedings in a willful violation of the visitation order.

The record reveals that appellants were aware of the lower court's visitation order and that they willfully interfered with it. After evaluating the credibility of the witnesses, Judge Crabtree specifically found that appellants were not acting in good faith when they took Jeffrey into custody. This is not a case in which DHS employees were completely unaware of the civil

proceedings being conducted simultaneously with the juvenile proceedings. Appellants were aware of the alleged sexual abuse months before the divorce proceeding. They never filed any kind of action alleging that Jeffrey should be removed from his mother's home. However, on February 16, 1991, appellant Henry, with appellant Roth's approval, went to Mrs. Eberhard's home, accompanied by a police officer, removed Jeffrey and placed him in foster care for three days. They took these actions in complete disregard of any resulting trauma to Jeffrey or his family. There is substantial evidence to support the finding of a lack of good faith.

Appellants argue they acted as officials of DHS and were therefore immune from being held in contempt pursuant to Ark. Code Ann. § 12-12-510 (1987). This argument of immunity is without merit.

We agree that appellants acted as DHS officials when they initiated taking protective custody of Jeffrey. We also agree that section 12-12-510, and the current statute, Ark. Code Ann. § 12-12-517 (Supp. 1991), presumes the good faith of DHS officials and grants them immunity from civil or criminal liability for their actions in investigating and reporting child abuse. However, section 12-12-510 does not grant immunity from contempt proceedings, because the power of contempt is granted to our courts in the Arkansas Constitution and cannot be abridged by the General Assembly. *See Yarbrough* v. *Yarbrough*, 295 Ark. 211, 748 S.W.2d 123 (1988). To extend section 12-12-510 to grant immunity from civil and criminal contempt would be an abridgement of the court's power to punish for disobedience of process; such an abridgement is prohibited. We conclude, therefore, that appellants are not immune from a contempt proceeding and there was no error committed by holding them in contempt of court.

Appellants' second assignment of error is that both chancellors acted with bias and prejudice in conducting the proceedings to the extent that their constitutional right to present a defense was violated. In addition to merely alleging that error has occurred, appellants must demonstrate the prejudice caused by the alleged error. *Smith* v. *State*, 307 Ark. 223, 818 S.W.2d 945 (1991). Here, appellants have not met their burden of

showing that prejudice occurred.

 Appellants argue that Judge Huffman was predisposed regarding the sexual abuse of Jeffrey and DHS's pending petition in juvenile court. For whatever reason, be it the allegations of Mr. Eberhard's sexual abuse of Jeffrey without any substantiated reports from DHS or something else entirely different, Judge Huffman felt compelled to require that Mr. Eberhard's visitation of Jeffrey be supervised by a third person. Had he been predisposed regarding Mr. Eberhard's alleged abuse of Jeffrey, he would not have provided the safeguard of supervision when he granted visitation. The supervisory safeguard is convincing evidence that Judge Huffman was not predisposed one way or the other regarding the alleged sexual abuse.

 Appellants also argue that Judge Huffman's consolidation of the divorce case and the juvenile case is evidence of his bias and prejudice. The consolidation was nothing more than an expression of Judge Huffman's concern that all the custody issues be resolved consistently. There was no bias or prejudice in the consolidation of the two cases. We note that once the show cause orders were issued, Judge Huffman correctly recused from the case in an effort to avoid the appearance of impropriety. We conclude he did not act with bias or prejudice.

 With respect to Judge Crabtree, appellants argue he prevented them from presenting a defense to the contempt charge because he called their counsel as a witness. It is true that counsel was called as a witness, however, appellants were still allowed to rebut the charge of contempt. They had a hearing in which the trial judge received evidence and heard their defense. Contempt is a unique proceeding where the judge acts as both trier and finder of fact. Judge Crabtree did not act with bias or prejudice in calling counsel as a witness.

In their attempt to articulate their second assignment of error, appellants make numerous accusations of the lower courts which are disrespectful. Appellants state that a concise picture of what happened in Benton County cannot be presented to this court because they "sincerely believe a spark was ignited that turned into a blaze for reasons other than the administration of justice." Appellants accuse the trial court of "pursuing an independent agenda" and characterize its conduct as "calculated

to lead to the public humiliation of the officials of the Department of Human Services."

The above-quoted language from appellants' brief is so offensive that it prompted the intervenor, the Attorney General, to request that the language be stricken from the briefs. Pursuant to Ark. Sup. Ct. R. 6, and *McLemore* v. *Elliot*, 272 Ark. 306, 614 S.W.2d 226 (1981), we conclude the intervenor's motion is well-taken. In *McLemore*, as a sanction for violating Ark. Sup. Ct. R. 6, we struck the briefs containing the language that was disrespectful to the trial court from the records of this court. The language used in the present case is far more inflammatory and disrespectful than the language used in *McLemore*. Accordingly, we grant the intervenor's request to strike pages 462-67 of appellants' brief from our records.

Appellants' third assignment of error is that the chancery court acted arbitrarily and erroneously in vacating the juvenile court's order restraining Mr. Eberhard from visiting his son, Jeffrey. This issue is not properly before us on this appeal.

The restraining order in question was issued in the juvenile court in a proceeding where DHS, as opposed to appellants, petitioned the court for supervision of Jeffrey. Thus, it is DHS, not appellants, that would have been prejudiced by any error in the dissolution of the restraining order. However, appellants' final notice of appeal from their contempt proceedings does not list DHS as an appellant. As DHS is not a party to this appeal, this issue is procedurally barred. *See* Ark. R. App. P. 3(e), and *Arkansas Dep't of Human Servs.* v. *Shipman*, 25 Ark. App. 247, 756 S.W.2d 930 (1988).

We note that any prejudice DHS may have encountered by the dissolution of the restraining order was remedied when DHS and the Eberhards reached a settlement concerning Jeffrey's status as a dependent and neglected child. This settlement suspended Mr. Eberhard's visitation with Jeffrey for thirty days and provided for supervised visitation thereafter. Thus, DHS's interest in protecting Jeffrey from sexual abuse was achieved and DHS suffered no prejudice.

As their fourth assignment of error, appellants claim the trial court erred in entering a gag order in violation of their

constitutional rights. Appellants claim the gag order violated their rights to a free discussion of the issues and a review in an open forum to ensure a fair trial. Although appellants expressed their general objection to the gag order to the trial court, they never asserted that any of their constitutional rights would be violated by the entry of the gag order. They certainly never argued to the trial court that their constitutional rights of expression, association, and fair trial were violated by the gag order. We have consistently held in criminal appeals that arguments, even constitutional ones, not presented to the trial court will not be addressed on appeal. *Ussery* v. *State*, 308 Ark. 67, 822 S.W.2d 848 (1991).

Appellants' fifth assignment of error is that the trial court placed appellant Henry in double jeopardy by increasing her jail sentence for contempt. The record does reveal that Henry's sentence for imprisonment was increased when the trial judge modified the suspension of her sentence from an eighty-day suspension to a sixty-day suspension. However, the record also reveals that Henry did not make an objection to the modified sentence on former jeopardy grounds at the time the sentence was modified. Objections must be timely, *Lewis* v. *State*, 307 Ark. 260, 819 S.W.2d 689 (1991), and even constitutional objections are waived unless made to the trial court. *Ussery, supra.*

Affirmed.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. The effect of today's holding is that when an employee of the Department of Human Services (DHS) undertakes, pursuant to Ark. Code Ann. § 12-12-509 (1987), to take a child into temporary protective custody to prevent imminent danger of child abuse, thereby interfering with court ordered visitation by the parent suspected of causing such abuse, that employee becomes subject to contempt proceedings. Nothing in § 12-12-509 indicates that such power is not to be exercised so as to impinge on visitation rights ordered in a divorce suit, pending or concluded.

But even if the appellants' conduct in this affair renders them culpable, the fines and jail sentences imposed are seriously disproportionate to the circumstances. These appellants are not

disgruntled parties flaunting the authority of the court, nor officious intermeddlers in an affair that does not concern them. Rather, they are agents of that division of state government (DHS) to which the legislature has assigned the specific task of alleviating and preventing child abuse, whether substantiated or merely suspected. Neither appellant was acting pursuant to some personal motive but purely in response to a perceived responsibility under the law. I do not suggest that that responsibility is transcendent to the authority of the trial court, but I do submit that a number of factors mitigate on the side of greater leniency than the singularly harsh sentences imposed. For one thing, the indications of parental abuse were sufficiently serious that the trial court took extraordinary measures; for another, the trial court's order (verbally delivered on February 14, 1991, but not reduced to writing for six weeks) was decidedly vague in its terms:

THE COURT: And as to visitation, I'm going to order visitation under the conditions provided for by the defendant that there will be a third party, someone else present when he's visiting to make sure that if he's accused there's some reputable person present that can vouch for his conduct and the child's conduct throughout that time. And since he's agreeable to that, I think that's a good, wise decision, and we'll do it that way. (R. 532-533).

MS. DUNCAN: Can we start our visitation this weekend? It's been a long time since Mark has seen his son.

THE COURT: Yes. You bet.

MS. DUNCAN: Thank you.

MR. EVANS: Do we know what, who the third party is going to be in this? Could they submit something so we kind of can at least condition the child?

THE COURT: Well, I'm reluctant to get involved in a situation where we're talking about this side is having to approve that side. You know. The plaintiff, in other words, are we going to submit a list of names to the plaintiff to see if they're okay to be the third party?

MR. EVANS: No. I didn't say that. I didn't mean to indicate that. It's— The child, I think, will need to be

conditioned to certain, that you're going and this one's going to be there and that sort of thing. And if we know who the parties were going to be, then we could lay that foundation.

THE COURT: Okay. If you know who the person is, I don't mind telling them, but it's not a condition of the decree. (R. 535-536).

MR. EVANS: Your Honor, was that visitation going to be this weekend or—?

THE COURT: Yes, as far as I'm concerned. I don't know any reason why not. (R. 537)

THE COURT: And as far as the visitation is concerned, you know, for how long, I intend ordering, like weekend visitation and holiday visitation in the directive. For this week, you know, for the first time, you might want to, you know, I don't know how much time you have to visit nor how long, and you might feel it appropriate to visit less than, a shorter period of time.

MR. DUNCAN: Yes sir, that's what we had discussed, as a matter of fact, was for a period of maybe four hours on Saturday and then again for a period of about four hours on Sunday.

THE COURT: Well, that sounds like you're using your head.

MR. EVANS: That's what you're proposing?

MS. DUNCAN: That's for this weekend.

MR. EVANS: Yeah. Okay. And the rest of the visitation, you're going to set that out at a later time?

THE COURT: I'll put it in the decree, right. But I'll try to be pretty standard with it. (R. 538).

For another thing, the law not only imposes an affirmative duty on the appellants, among others, but clothes them with immunity in the discharge of those responsibilities. Ark. Code Ann. § 12-12-510 (1987). Finally, while appellants may have been generally aware of the verbal order, there is no showing that their claim to

have been unaware of its *terms*, is false. Taking these factors into account I believe a more judicious solution would have been an admonition and a warning as opposed to a sizeable fine, a jail sentence and a psychiatric examination.