Lade Thomas CONLEE *v.* Jennifer CONLEE

06–586                                    257 S.W.3d 543

Supreme Court of Arkansas
Opinion delivered May 24, 2007

*Dodds, Kidd & Ryan*, by: *Stephanie Chamberlin* and *Judson Kidd*, for appellant.

*Allison R. Allred, P.A.*, by: *Allison R. Allred*, for appellee.

Tom Glaze, Justice. This is an appeal from a divorce case with a long and complicated history. Appellant Lade Thomas Conlee Jr. ("Tom") and appellee Jennifer Conlee ("Jennifer") were married on December 12, 1996, and separated in April or May of 2004.[1] On May 26, 2004, Jennifer filed a complaint for divorce. Tom answered and counterclaimed for divorce on June 14, 2004. On June 25, 2004, Jennifer served a set of interrogatories and requests for production on Tom. On July 26, 2004, Tom filed a motion seeking an extension of fourteen additional days to file his responses to Jennifer's voluminous requests for discovery. Jennifer responded that she had no objection to the extension, providing that no more than two extra weeks were granted, given that the parties had

---

[1] Jennifer's complaint for divorce asserted that the couple separated on April 28, 2004; Tom's answer avers that they separated on May 16, 2004.

a trial date in October of 2004. Fourteen days from the July 26, 2004, deadline would have given Tom until August 9, 2004, to file his discovery responses.

On September 30, 2004, Jennifer filed a motion to compel discovery, asserting that, despite the agreement to give Tom extra time to file his responses, he did not furnish timely discovery responses by August 9, 2004. While acknowledging that Tom submitted responses on August 23, 2004, Jennifer alleged that those responses were "unsigned, unverified, [and] incomplete." In conjunction with her motion, Jennifer sought attorney's fees and costs. The trial court entered an order on October 5, 2004, granting Jennifer's motion to compel discovery, requiring Tom to provide "full, complete responses" by October 8, 2004, and noting that all objections to discovery requests were waived as they had not been made by August 9, 2004.[2]

On October 12, 2004, Jennifer filed a second motion to compel discovery and a motion for continuance. In that motion, she alleged that Tom had failed and refused to meet the court-ordered October 8, 2004, discovery deadline and that he "continue[d] to thwart discovery efforts." Following an October 13, 2004, hearing on Jennifer's motion to compel, the trial court entered an order in which it found that, due to Tom's failure to name witnesses in a timely fashion in response to a specific interrogatory, he would not be permitted to call any witnesses at trial other than the parties. In addition, the court ordered Tom to answer, by 9:00 a.m. on Friday, October 15, 2004, certain interrogatories and requests for production that identified any exhibits or documents he intended to use at trial. The court warned that if any such potential exhibits were not provided to Jennifer by 9:00 a.m. on October 15, Tom would not be permitted to use them at trial. In addition, the court ordered Tom to provide "complete, verified discovery responses" by 9:00 a.m. on Friday, October 15, 2004. Finally, the court ordered Tom to pay a fine of $1,500 as a result of his failure to comply with the October 5, 2004, order to compel; the fine was to be paid prior to the start of trial on October 25, 2004.

---

[2] Tom sought reconsideration of the trial court's order compelling discovery in a motion filed on October 8, 2004. The trial court denied his motion for reconsideration on October 18, 2004.

On October 20, 2004, Jennifer filed a motion for contempt in which she contended that, despite the court's order, Tom had still failed to provide any of his exhibits by October 15 and had provided only partial, unverified discovery responses to the office of Jennifer's counsel at approximately 2:30 p.m. on Friday, October 15. Due to his failure to comply with the court's orders, and because the motion for contempt was the third motion addressing the same discovery issues, Jennifer argued that Tom should be held in contempt and ordered to pay attorney's fees.

The trial court held a hearing on Jennifer's motion for contempt on October 25 and 26, 2004, the dates on which the trial had originally been scheduled. In a subsequent order, the court noted that Tom had paid his $1,500 fine on October 26, 2004, and that Jennifer had withdrawn her October 20, 2004, motion for contempt. The court's order also noted that the final hearing had been suspended in order to allow Jennifer an opportunity to investigate Tom's assets and other relevant issues and to review any discovery information that Tom had not previously produced. Accordingly, the court ordered Tom to produce "everything requested in discovery, which has not been previously produced, by Friday, October 29, at 9:00 a.m." If Tom failed to do so, the court instructed Jennifer to file a motion for contempt.

On November 5, 2004, Jennifer filed such a motion for contempt, alleging that Tom had failed to meet the October 29 deadline; however, she conceded that he had produced "some but not all bank statements and some credit card records at 8:58 on that date." That same afternoon, the court entered an order directing Tom to appear and show cause why he should not be held in contempt for failing to obey the court's orders.

Tom filed a response on November 22, 2004, in which he asserted that he had substantially complied with Jennifer's discovery requests. Although he admitted that he had failed to meet the October 15, 2004, 9:00 a.m. deadline, he contended that the bulk of the requested material had been sent via Federal Express from Memphis to Little Rock and did not arrive until after 9:00 a.m. Tom also alleged that some of the bank statements and credit card statements that Jennifer sought were simply not in his possession at the time of the October 26 order or prior to that time.

After both parties jointly moved for a continuance of the divorce hearing, the court set a trial date for January 14, 2005. On January 11, 2005, Jennifer filed a discovery motion in which she

contended that Tom had still not complied with outstanding discovery requests, despite repeated motions addressing the same deficiencies and repeated orders of the court requiring him to do so. On February 8, 2005, the court entered an order of incarceration in which it found that Tom had "willfully failed and refused to comply with this court's discovery orders, after being given repeated opportunities to comply." The court thus sentenced Tom to seven days in the Pulaski County Detention Center.[3] Tom served all seven days of that sentence.

Following the completion of his jail sentence, the trial court entered a divorce decree on March 8, 2005. Contained within the divorce decree was a ruling on Jennifer's second motion for contempt. In addition to the court's previous contempt findings and the previous seven-day jail sentence, the court imposed "an additional sentence of two weeks (fourteen days') incarceration to be served by [Tom] as a result of his failure and refusal to abide by discovery orders throughout the course of this litigation." However, the court stayed the imposition of incarceration pending Tom's compliance with three conditions. Tom was ordered to: 1) pay an attorney's fee to Jennifer in the amount of $6,500, with half of that amount being due within thirty days of February 15, 2005; 2) sign any authorizations presented to him by Jennifer's counsel in order for Jennifer to have "unfettered access to investigate any assets, liabilities, real property, personal property, corporate property, or other property or ownership interests of any kind"; and 3) pay a $1,000 fine to the court within thirty days of February 15, 2005. If Tom failed to comply with all three conditions, the court found, he was to be incarcerated for an additional period of two weeks.[4]

On March 21, 2006, Jennifer filed an affidavit in which she asserted that her attorney's fees had not yet been paid, as ordered by the court in the divorce decree. She also noted that the court had not yet received the fine Tom was ordered to pay. Therefore,

---

[3] Tom filed with our court a petition for writ of mandamus and petition for emergency consideration of the court's order of incarceration. This court denied his petition on February 14, 2005. Tom also filed a motion for reconsideration in the trial court, which was denied.

[4] Tom filed a notice of appeal from the divorce decree on March 18, 2005. Our court dismissed his appeal because the trial court had lacked jurisdiction to consider and grant a motion for extension of time to lodge the record. *See Conlee v. Conlee*, 366 Ark. 342, 235 S.W.3d 515 (2006).

she requested that the court issue a pick-up order and body attachment for Tom's incarceration, which the court did on March 22, 2005.

On March 23, 2005, Tom filed a motion to rescind the pick-up order, contending that he had cured his contempt by personally going to Jennifer's attorney's office to pay her attorney's fee and tendering payment of $1,000 to the court. Attached to his motion was a copy of the checks he had written to Jennifer's attorney, dated March 22, 2005, and the receipt from the Pulaski County Clerk's office showing that the $1,000 was paid on March 23, 2005. Jennifer responded by pointing out that, even though Tom had paid the amounts ordered, the court's order directed that if he failed to meet all three conditions "within the time frame ordered by the court," he would be incarcerated. Tom also filed a motion to stay the property division ordered in the divorce decree pending the appeal. Jennifer responded that he had failed to post a supersedeas bond and thus was not entitled to a stay.

On March 28, 2005, Jennifer filed yet another motion for contempt. In this motion, she pointed out that the divorce decree ordered each party to timely make one-half of the mortgage payments, but Tom had failed to do so, causing the mortgage payments to be roughly ninety days behind. Jennifer noted several other orders in the divorce decree with which Tom had not complied, including his failure to reimburse Jennifer for part of the mortgages, to sell the couple's car, and to divide certain assets and liabilities. Tom responded to Jennifer's motion for contempt by arguing that he had appealed the divorce decree and did not wish to waive any defense he might have against the payments ordered in the decree; he also stated his willingness to post a reasonable bond. Nonetheless, the court issued a show-cause order, directing Tom to appear in court on April 28, 2005, and May 12, 2005.

The court held a hearing that began on May 12, 2005, and was continued to August 15, 2005. At the conclusion of the August 15 hearing, Tom wrote a check for $11,640.62, which the parties agreed was paid under protest, for repayment of the mortgages, repairs to the home, taxes, and attorneys' fees. The court continued the hearing until September 2, 2005. At the September 2 hearing, the court addressed Tom's motion to rescind the pick-up order. Tom argued that he had substantially complied with the court's orders to pay the attorney's fees and fine, but Jennifer replied that he had not done anything he had been ordered to do on time.

The court denied the request to rescind the pick-up order, but adjusted the contempt sentence it had imposed in the March 8, 2005, divorce decree from fourteen days to seven days. The court also allowed Tom a few days to put his affairs in order before going to jail, but ordered him to post a surety bond of $15,000 in order to ensure his appearance at the Pulaski County Jail on September 7, 2005. On September 7, 2005, Tom filed a notice of appeal from the court's September 2, 2005, order finding him in contempt "and any other contempt orders filed prior to September 2, 2005." The court then entered an "order of clarification" on September 8, 2005, restating its rulings from the September 2 hearing; that order noted that the order of incarceration did not stem from Jennifer's pending motion for contempt filed on March 28, 2005, because the court had not yet ruled on that motion. Tom filed an amended notice of appeal on September 16, 2005, in order to incorporate the September 8 order.

On October 24, 2005, Jennifer filed yet another motion for contempt, alleging that, despite the September hearing, Tom was still not making payments on the mortgages or paying his half of expenses and insurance. On November 2, 2005, Tom posted a supersedeas bond in the amount of $15,000, stating that the bond was to ensure that he would report to the Pulaski County Jail to serve the September 2, 2005, sentence in the event he lost on appeal. A writ of supersedeas was issued that same day, directing the parties to stay execution or other enforcement proceedings on the September 2, 2005, order.

Following a hearing on November 22, 2005, the court entered an order on January 10, 2006, in which it granted Jennifer's motion for contempt. The court specifically found that Tom was in contempt for failing to: 1) pay his half of the mortgages; 2) pay his obligations regarding home repairs; 3) sell the vehicle after the court ordered him to do so in January of 2005; 4) equally divide certain accounts he had been ordered to divide; and 5) timely pay the attorney's fee and fines as ordered in the divorce decree. The court did not, however, find Tom in contempt for his failure to pay half of the real and personal property taxes, because the court had not set a deadline for such payments.

The court's order then sentenced Tom to fifteen days' incarceration, in addition to the fourteen days imposed in the divorce decree. Tom was ordered to report to the Pulaski County Detention Center forthwith to serve twenty-nine days of detention. He was also ordered to pay a $500 fine to the Pulaski County

Circuit Clerk by December 22, 2005, and $4,500 in attorney's fees in two installments, due on January 6, 2006, and February 10, 2006. Tom filed a third amended notice of appeal on January 31, 2006.[5]

Tom's first argument on appeal is that the trial court "gross[ly] misuse[d]" its judicial authority and inherent power to assess fines of $3,000, attorney's fees in excess of $12,000, jail time of thirty-six days,[6] and preclude him from calling any witnesses or introducing any evidence at the divorce trial. In a contempt case, the first question this court must address in deciding whether the contempt sanctions imposed were appropriate is whether the contempt was civil or criminal. Criminal contempt preserves the power of the court, vindicates its dignity, and punishes those who disobey its orders. See Johnson v. Johnson, 343 Ark. 186, 198, 33 S.W.3d 492, 499 (2000); Ivy v. Keith, 351 Ark. 269, 279-80, 92 S.W.3d 671, 677 (2002).

Our court has often noted that the line between civil and criminal contempt may blur at times. Id. However, we noted in Ivy, supra, that our court of appeals has "given a concise description of the difference between civil and criminal contempt. . . . '[C]riminal contempt punishes while civil contempt coerces.' " Id. (citing Baggett v. State, 15 Ark. App. 113, 116, 690 S.W.2d 362, 364 (1985) (emphasis in original).

In determining whether a particular action by a judge constitutes civil or criminal contempt, the focus is on the character of relief rather than the nature of the proceeding. Id. (citing Fitzhugh v. State, 296 Ark. 137, 138, 752 S.W.2d 275, 276 (1988)). Because civil contempt is designed to coerce compliance with the court's order, the contemnor may free himself or herself by

---

[5] Tom also filed a motion for stay with this court on January 31, 2006, which was denied on February 23, 2006.

[6] Presumably, Tom draws this figure from the first seven days in jail the court imposed in February of 2005 for his discovery violations, plus the fourteen-day sentence contained in the March 2005 divorce decree and the additional fifteen days imposed in the court's January 10, 2006, order. As he served the first seven days arising from the February 2005 contempt order, only twenty-nine days are still pending. Moreover, any argument he might raise on appeal pertaining to that seven-day sentence for contempt is moot, as he has completed that sentence and paid the fine associated with that contempt order. This court has noted that, when a contemnor has paid his fines, he "purged [his] contempt [and] rendered the propriety of the contempt order moot." Central Emergency Med. Servs. v. State, 332 Ark. 592, 594, 966 S.W.2d 257, 259 (1998).

complying with the order. *Id.*, 92 S.W.3d at 678. This is the source of the familiar saying that civil contemnors "carry the keys of their prison in their own pockets." *Id.* (quoting *Fitzhugh*, 296 Ark. at 140, 752 S.W.2d at 277). Criminal contempt, by contrast, carries an unconditional penalty, and the contempt cannot be purged. *Id.* (citing *Fitzhugh*, 296 Ark. at 139, 752 S.W.2d at 276-77).

In the instant case, neither party disputes that the contempt sanctions imposed by the trial court were criminal in nature.[7] *See Fitzhugh v. State*, 296 Ark. at 139, 752 S.W.2d at 276 ("[a]n unconditional penalty is criminal in nature because it is solely and exclusively punitive in character"). The standard of review of a case of criminal contempt is well settled: an appellate court views the record in a light most favorable to the trial judge's decision and will sustain the decision if supported by substantial evidence. *Hodges v. Gray*, 321 Ark. 7, 11, 901 S.W.2d 1, 3 (1995).

An act is contemptuous if it interferes with the order of the court's business or proceedings, or reflects upon the court's integrity. *Hodges*, 321 Ark. at 14, 901 S.W.2d at 4; *see also Carle v. Burnett*, 311 Ark. 477, 845 S.W.2d 7 (1993). Where a person is held in contempt for failure or refusal to abide by a judge's order, the reviewing court will not look behind the order to determine whether it is valid. *Johnson v. Johnson*, 343 Ark. at 197, 33 S.W.3d at 498; *see also Etoch v. State*, 332 Ark. 83, 964 S.W.2d 798 (1998).

In the present case, as the facts set out above make clear, Tom repeatedly and consistently refused to abide by the court's orders both before and after the divorce decree was entered. Although the contempt sanctions stemming from the discovery orders are moot, as mentioned above, the trial court nonetheless, on numerous occasions, ordered Tom to provide complete discovery answers in a timely fashion; however, he failed to comply with those orders until Jennifer brought a motion for contempt. Indeed, he even agrees in his brief that "[t]he record is replete [with instances on which] he was untimely with his production[.]"

---

[7] Although we affirm the trial court's decision to hold Tom in contempt, we question the efficacy of utilizing criminal contempt as a tool to obtain his compliance. Given his repeated and obvious failures to abide by the trial court's orders, it seems that civil contempt — with its ability to imprison a contemnor until such time as he or she obeys a court's orders — might have been a more efficient means of ensuring his compliance in this case. From a review of the record, Tom never asserted that he did not have the ability to pay the monies owed to Jennifer.

Moreover, regarding the contempt citations entered in and after the divorce decree, the record is likewise full of occasions on which Tom failed and refused to obey the court's orders. For example, the decree specifically provided that, in addition to the previous contempt findings, if Tom failed to abide by the three conditions imposed by the court (payment of attorney's fees by a given date, payment of a fine by a certain date, and allowing Jennifer to further investigate his assets), he would be incarcerated for an additional fourteen days. The order was explicit in stating that Tom would be held in contempt if he failed to abide by the order's terms, providing that if he "[did] not comply with all three conditions . . . or if [he] does not meet all three conditions within the time frame ordered by the court, [he] shall be incarcerated for an additional period of two weeks (fourteen days)."

It is beyond dispute that Tom repeatedly failed to comply with the court's orders within the schedule declared by the court. He paid neither the fine nor the attorney's fees until Jennifer filed her motion for contempt and motion for pick-up order and body attachment. His behavior demonstrated a consistent pattern of not abiding by the court's directives until compelled to do so.

The final contempt issue was Tom's failure to pay the various marital debts, including the mortgages, insurance, and certain home repairs, as well as his failure to sell the vehicle, as ordered by the court. In his brief, Tom admits that he failed to make payments on the mortgages, taxes, and repairs, and that he failed to sell the car. However, he asserts that he "is trying to pay his debts." Despite these assertions, though, the evidence before the trial court was overwhelming that he persistently refused to fulfill his court-ordered obligations.

Willful disobedience of a valid order of a court is contemptuous behavior. *Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 156 S.W.3d 228 (2004); *Allison v. DuFresne*, 340 Ark. 583, 12 S.W.3d 216 (2000). As stated above, before one can be held in contempt for violating a court order, the order must be definite in its terms and clear as to what duties it imposes. *Ark. Dep't of Health & Human Servs. v. Briley*, 366 Ark. 496, 237 S.W.3d 7 (2006). In this case, Tom does not dispute that the court's orders were valid, definite, and clear. He simply maintains that the punishment was too severe. However, "[i]n contempt cases, the trial court has discretion to fashion the punishment to fit the circumstances." *See Omni Holding*, 356 Ark. at 455, 156 S.W.3d at

239 (citing *Hubbard v. Fleet Mortgage Co.*, 810 F.2d 778, 782 (8th Cir. 1987)). Given Tom's consistent recalcitrance in complying with the court's orders, it seems apparent that the court determined that imposing fines and incarcerating Tom was the only way to get his attention. In short, there was substantial evidence both to support the trial court's decision to hold Tom in contempt and to warrant the punishments that the court imposed. *See Nooner v. Nooner*, 278 Ark. 360, 366, 645 S.W.2d 671, 675 (1983) ("no person has a right to disobey an order of the court").

However, we must modify the sentence that the trial court imposed. As mentioned above, on the second contempt order arising out of the March 2005 divorce decree, the trial court initially sentenced Tom to serve fourteen days in jail, but later reduced that sentence to seven days in jail. However, in the final January 10, 2006, order, the court changed the sentence back to fourteen days. This reinstatement of the original fourteen-day sentence was improper. This court has held that "suspension of a sentence for contempt is in effect a complete remission of the contempt." *See Henry v. Eberhard*, 309 Ark. 336, 832 S.W.2d 467 (1992); *Higgins v. Merritt*, 269 Ark. 79, 598 S.W.2d 418 (1980). When applying this rule concerning remission, we have indicated that when part of the sentence is suspended, the portion that was suspended is remitted, but the remaining portion of the contempt still exists. *Henry, supra; James v. James*, 237 Ark. 764, 375 S.W.2d 793 (1964). Thus, although we affirm the orders holding Tom in contempt, we modify Tom's sentence to reflect that the seven days should have remained suspended.

Tom raises a brief second point on appeal, asserting that the trial court's determination that his contempt was willful was not supported by substantial evidence. He points to his testimony that, in withholding his payments, he was simply acting on his attorney's advice. For example, he testified at the August 15, 2005, hearing that his attorney had told him that the action had been stayed pending appeal, so he did not believe that he had to comply with the court's orders. However, in *Carle v. Burnett, supra*, this court wrote that the "fact that the decree has been appealed from [does not] excuse disobedience until the same has been superseded in a manner provided by law. The appeal alone does not stay proceedings under the decree, and as long as the decree remains in force its terms must be obeyed." *Carle*, 311 Ark. at 480,

845 S.W.2d at 9 (quoting *Meeks v. State*, 80 Ark. 579, 98 S.W. 378 (1906)). Tom did not offer any proof at the hearing that the appellate court had granted a stay; accordingly, it is of no moment that he "believed" he did not have to comply with the trial court's orders.

We turn next to Jennifer's single point on cross-appeal. In the divorce decree, the trial court made the following ruling:

> *Assets not Disclosed by Defendant.* If Plaintiff discovers any assets belonging to Defendant or held in Defendant's name or that of his company, which were not specifically disclosed by Defendant in his discovery responses, the Court finds that Plaintiff shall be awarded 100% of whatever asset(s) are discovered by Plaintiff. If Plaintiff discovers any such asset(s), Plaintiff shall file a Petition within 120 days of February 15, 2005, asking the court to issue an order declaring said asset(s) to be the separate property of Plaintiff, free of any claim by Defendant.

Following the decree, Jennifer discovered three additional accounts that belonged to MTC Management, Inc., a company in which Tom owned 100% of the shares; the balances in those three accounts totaled $367,590.35. Upon discovering them, Jennifer filed a petition concerning assets not disclosed.[8]

At a hearing on Jennifer's petition, Tom testified that he and Jennifer had entered into a Reconciliation Agreement in 1999. In that Agreement, Jennifer agreed to "release any claim she may have to MTC," and Tom "shall own MTC free and clear of any claims by [Jennifer] in the event the reconciliation attempt is unsuccessful." In an interim order dated January 26, 2005, the trial court froze all of Tom's accounts, except for certain MTC corporate accounts — specifically, the MTC Escrow Account and MTC Trust Account — because those corporate accounts contained funds deposited by third parties that did not belong to Tom.

The accounts that Jennifer discovered were two MTC Escrow Accounts and one MTC Trust Account. In denying Jennifer's petition concerning assets not disclosed by defendant,

---

[8] Jennifer actually filed two such petitions. However, the first petition, filed on March 1, 2005, was somehow not included in the record prepared by the circuit clerk's office. This court denied Jennifer's petition to supplement the record with this first petition on March 16, 2007. However, the second petition concerning assets not disclosed was in the record, and the issue is, accordingly, properly preserved and before us.

the trial court noted that Jennifer did not meet her burden of proving by a preponderance of the evidence that the accounts belonged to Tom. The order stated that the court did not "include in its [previous] ruling [the] assets of a non-party." In a handwritten notation at the conclusion of the order, the court wrote that it "[did] not have sufficient evidence in the record to find that the funds in the accounts in question belong to [Tom] personally, as opposed to a corporation that has not been made a party in this action."

■ Although Jennifer argues on appeal that Tom's explanations about the accounts were inconsistent, the trial court nonetheless clearly accepted his testimony that the funds in the accounts belonged to MTC and not to Tom. Our standard of review in matters involving the division of property in a divorce case is clear:

> With respect to the division of property in a divorce case, we review the chancellor's findings of fact and affirm them unless they are clearly erroneous, or against the preponderance of the evidence; the division of property itself is also reviewed, and the same standard applies. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. In order to demonstrate that the chancellor's ruling was erroneous, an appellant must show that the trial court abused its discretion by making a decision that was arbitrary or groundless. We give due deference to the chancellor's superior position to determine the credibility of witnesses and the weight to be given their testimony.

*Gray v. Gray*, 352 Ark. 443, 454, 101 S.W.3d 816, 821 (2003); *Skokos v. Skokos*, 344 Ark. 420, 40 S.W.3d 768 (2001). Given the standard of review and the testimony before the court, we cannot say that the trial court's conclusions were clearly erroneous.

Affirmed as modified on direct appeal; affirmed on cross-appeal.